**John T. SATTERWHITE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 70951.**

Court of Criminal Appeals of Texas, En Banc.

March 10, 1993.

Rehearing Denied June 9, 1993.

---

414

George Scharmen (Court appointed), San Antonio, for appellant.

Steven C. Hilbig, Dist. Atty., and Bill Harris, Anne Kelley & Edward F. Shaughnessy, III, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

PER CURIAM.

Appellant's first conviction for the offense of murder in the course of committing robbery, a capital offense under V.T.C.A. Penal Code, § 19.03(a)(2), was reversed by the United States Supreme Court for error committed during the punishment phase. *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). Appellant has now been tried and convicted a second time. Once again the jury answered special issues affirmatively and punishment was assessed accordingly at death. Article 37.071(b), V.A.C.C.P. Appeal to this Court is automatic. *Id.*, § h.

On March 12, 1979, Mary Frances Davis was found dead in the restroom of the Lone Star Ice & Food Store No. 18 in San Antonio. Davis, the day manager of the store, was the victim of two .22 caliber gunshot wounds to the head. An audit of the store's receipts revealed a shortage of $629 and some cents. Appellant raises seventeen points of error but does not contest the sufficiency of the evidence to establish he committed the offense. We will affirm.

In his first eight points of error, appellant complains of error which he contends occurred during jury selection. Although the alleged errors occurred during the individual questioning of the prospective jurors, due to their similarity, and for the sake of brevity, we have combined some of appellant's arguments. In each of these points of error, appellant argues the trial court erred in denying his challenge for cause because the venireman in question held prejudices against an aspect of the law upon which he was entitled to rely. See Article 35.16(c)(2), V.A.C.C.P. In each instance, the trial court overruled his challenge for cause and appellant used a peremptory strike to exclude the venireman. Appellant exhausted all of his peremptory challenges and his request for additional strikes was denied. He identified a number of objectionable jurors who sat as a consequence. Thus, error, if any, was preserved. See *Felder v. State*, 758 S.W.2d 760 (Tex.Cr.App.1988).

At the outset, it is important to recognize that this Court reviews jury selection from a cold record. It is the trial judge who has the opportunity to view each venireman's demeanor, evaluate his credibility and, ultimately, who is in the better position to pass on the challenges for cause presented. *Smith v. State*, 676 S.W.2d 379, 387 (Tex. Cr.App.1984). Thus, in analyzing a trial court's denial of a challenge for cause we must examine the record as a whole to determine whether there is support for the trial judge's decision, and in doing so we give great deference to the trial court's actions. *Holland v. State*, 761 S.W.2d 307 (Tex.Cr.App.1988); *Franklin v. State*, 693 S.W.2d 420 (Tex.Cr.App.1985), cert. denied, 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986). This rule is particularly true when we are faced with an "equivocating" or "vacillating" venireman. *Perillo v. State*, 758 S.W.2d 567, 577 (Tex.Cr.App. 1988); *Holland*, supra. In reviewing challenges for cause, an appellate court will not disturb the decision of the trial court absent a showing of an abuse of discretion. *Williams v. State*, 773 S.W.2d 525 (Tex.Cr. App.1988).

By way of four points of error appellant contends the trial court erred in failing to grant his challenges for cause to veniremen Ashcraft, Seuferer, Rodriguez and Harper. Specifically, appellant argues these veniremen were unable to distinguish between the concepts of "intentionally" and "deliberately." Therefore, they would automatically answer statutory special issue number one in the affirmative. See Article 37.071(b)(1), V.A.C.C.P.

The first substantive discussion with veniremen Ashcraft and Harper concerning the interplay between the concepts of "intentionally" and "deliberately" occurred in the questioning by appellant's counsel. Ashcraft initially stated that deliberate and intentional sound "a little bit alike" and that there was "not much" difference. Similarly, Harper stated that "deliberate and intentional are ... similar or the same" and based upon his understanding, he would have a tendency to answer the first special issue "yes" based on the bare fact of a guilty verdict. However, in addition to

expressing difficulty with the distinction, both Ashcraft and Harper expressed confusion with defense counsel's questions. Through additional questioning by the trial court and the prosecutor some of the confusion was removed. Ultimately, both veniremen stated they saw a distinction between intentional and deliberate and neither would automatically answer the first special issue "yes."[1] Furthermore, Harper assured defense counsel that he would require more from the State in the way of proof in order to find beyond a reasonable doubt that whatever intentional act they have proven is also a deliberate act, and he clearly stated "deliberate and intentional are different."

For veniremen Seuferer and Rodriguez, the discussion of the distinction between intentionally and deliberately was initiated by the prosecution. In response to various questions both Seuferer and Rodriguez stated that they saw the distinction and would not automatically answer special issue number one in the affirmative merely because they had found the accused had committed an intentional murder. Nevertheless, when later questioned by appellant's counsel, both veniremen appeared to change their minds. Seuferer expressed his feelings that intentionally and deliberately were the "same thing." Likewise, Rodriguez "guessed" that having found an act to be intentional would make him automatically find it was a deliberate act as well.[2] Consequently, appellant asserted his challenges for cause. Before ruling, the trial court allowed the prosecutor to question further. The questioning of Seuferer went as follows:

"Q: I tried to be very careful awhile ago to illustrate for you that the answer to Question No. 1 should not be automatic, that there is a difference between intentional and deliberate conduct. And you told me you saw the distinction.

Now you are telling Mr. Scharmen that there is no distinction. Have you changed your mind? Or do you feel you do not fully understand it yet?

A: I fully don't understand it."

By way of example the prosecutor attempted to show the distinction. After this explanation, Seuferer stated again that he would not automatically answer "yes" to the first special issue just because he found the person guilty of intentionally causing the death.

As for Rodriguez, the prosecutor questioned him as follows:

"Q: I was trying to emphasize awhile ago that the first question should not

1. After expressing some difficulty with the distinction between intentional and deliberate the trial court questioned Ashcraft as follows:
"THE COURT: Obviously, if deliberately and intentionally were the same, they wouldn't be asking the same question the second time would they?
THE PANELIST: I don't believe so, sir.
THE COURT: So that you can see there is a distinction between deliberate and intentional?
THE PANELIST: Yes sir.
THE COURT: It may be slight, but there is. The question is, can you consider it, once having found it was intentional? Can you say it was not deliberate? Can you answer that question no, the first question, considering all of the evidence? That's the point. Can you do that?
THE PANELIST: Yes sir."
Again when appellant asserted his challenge for cause the trial court intervened.
"THE COURT: I think he says, as I understand it, that he saw a distinction between deliberate and intentional. Is that correct?
THE PANELIST: Yes, sir.
THE COURT: I understand he said it was slight, but that he saw a distinction between deliberate and intentional, and that as I understand it you said that even though you might have found a person to have done something intentionally, that you could still vote that he did not do it deliberately; is that correct?
THE PANELIST: Uh-huh
THE COURT: Am I correct in stating that?
THE PANELIST: Yes, sir."
Thereafter, appellant's counsel declined to further question the venireman and reasserted his challenge, which was denied.

2. Rodriguez appeared to change his mind in the following exchange with defense counsel:
"Q: And the evidence is put on, and you are asked this question. It talks about a deliberate act. Since you have found that this man acted intentionally, and there is no self-defense, wouldn't you automatically find that it was a deliberate act as well?
A: Yes, I guess. You just answered the question for me."

be answered automatically, that there is a difference between deliberate conduct and intentional conduct, and that you can have intentional conduct without deliberate conduct.

I think Mr. Scharmen just asked you, if you had found a person had intentionally caused the death, would you automatically vote that the conduct was deliberately committed?

And you said, "Yes." Did you mean that or—

A: Well, I guess just the way you worded the question sort of answered for me. If I go either way—"

At this point the court stepped in:

"THE COURT: We don't want these lawyers answering questions for you. We want you to answer the question. THE PANELIST: Like I said sir, I would have to wait and hear the case, the evidence, before I came to any conclusion, any answer.

THE COURT: Well, Mr. Scharmen told you that if you found that the individual did act intentionally, would you automatically find that he did it deliberately? And I understood you to say—

THE PANELIST: Yes, I understand. Sorry.

THE COURT: What is your feeling now? Do you want to think about it?

THE PANELIST: If he intentionally did it, automatically did he deliberately do it?

THE COURT: Yes.

THE PANELIST: No. Sir.... I guess the way I heard the question, I just didn't understand what you were saying. I do not agree that if he intentionally did it, did he deliberately do it."

It is readily apparent from the record that veniremen Ashcraft, Seuferer, Rodriguez and Harper were confused and equivocating in their response to counsel's questions. However, in his challenges for cause, appellant elevates confusion and equivocation to the level of inability to follow the law. *Sattiewhite v. State,* 786 S.W.2d 271 (Tex.Cr.App.1989). In support of his challenges to these four veniremen, appellant cites *Gardner v. State,* 730 S.W.2d 675 (Tex.Cr.App.1987), cert. denied,

484 U.S. 905, 108 S.Ct. 248, 98 L.Ed.2d 206 (1987), as authority. As we stated in *Sattiewhite, Gardner* "is instructive in that it shows the difficulty jurors have in understanding the difference between 'deliberate' and 'intentional.' However, the *Gardner* Court points out that a juror who fails to understand the difference between the two terms may be subject to challenge for cause absent rehabilitation or clarification of the responses." 786 S.W.2d at 281. As the excerpts above reveal, with further questioning, the veniremen's confusion was cleared up, their responses clarified and each stated he recognized the distinction between intentional and deliberate conduct. Furthermore, each stated he would follow the law and would not automatically answer the first special issue in the affirmative. These answers support a rational finding that the veniremen could follow the law. On such a record, we cannot say the trial court abused its discretion in overruling appellant's challenges for cause. Appellant's first four points of error are overruled.

In his fifth point of error, appellant asserts the trial court erred in denying his challenge for cause to venireman Sandra A. Franco. He contends Franco was subject to challenge for cause based on her answers to questions concerning the range of punishment. Specifically, he complains Franco could not consider imposing the minimum punishment in this case.

The dispute revolves around Franco's initial declaration that she could not consider the minimum sentence for a conviction of the potential lesser included offense of murder. However, further questioning by the trial court revealed that she misunderstood counsel's questions. Franco confused the discussion of lesser included offenses with an earlier discussion of her ability to stand by her vote as a juror and not give in to pressure from other jurors. Thus, she apparently understood counsel to be asking whether she would feel obliged to find the lesser included offense of murder if the other members of the jury felt appellant was guilty only of the lesser offense. After the trial court clarified some

of the confusion, Franco did say she could consider a lesser included offense.[3] Thereafter, defense counsel resumed his questioning. After several unsuccessful attempts to fully explain the concept of lesser included offense and the potential range of punishment in a capital murder trial, counsel asked Franco point blank:

> "Q: Would you, having found someone guilty of murder and being told by the judge that you could, would you consider assessing a punishment of five years probation?
>
> THE COURT: If the law says you can do that, and the facts prove it. You can do that; can you not?
>
> THE PANELIST: Yes.

CONTINUATION BY [DEFENSE COUNSEL]:

> Q: Would you automatically assess life imprisonment under that circumstance?
>
> THE COURT: He is saying automatically, without considering the evidence. That's what he is saying.
>
> THE PANELIST: No.
>
> THE COURT: In other words, could you consider the entire range of punishment as the law provides? Can you do that?
>
> THE PANELIST: Oh, yes."

 A venireperson who testifies unequivocally that she could not consider probation as a proper punishment for the lesser included offense of murder is properly the subject of a challenge for cause. *Pierce v. State,* 696 S.W.2d 899 (Tex.Cr. App.1985). Appellant asserts that Franco

---

**3.** In an attempt to clear some of the confusion, the court questioned Franco as follows:

"THE COURT: Did you understand what he is talking about?
THE PANELIST: No. What he just said, no.
THE COURT: You didn't understand what he was talking about?
THE PANELIST: No.
THE COURT: She didn't understand what you said.
　He wants to know whether you can consider a lesser included offense. If I put in my charge that you can find for a lesser included offense, can you follow the law?
　That's what he is saying. Can you do that?
THE PANELIST: No.
THE COURT: Do you understand what I am saying?

is such a venireman. However, our reading of the record shows otherwise. The initial questioning by the defense concerning the range of punishment left Franco very confused. Finally, after several attempts by the trial court to interpret and explain defense counsel's questions, Franco clearly stated that she could consider the full range of punishment as the law provides. Thus we find that the record supports the trial court's decision. Appellant's fifth point of error is overruled.

In point of error six appellant contends the trial court erred in denying his challenge for cause against venireman Jose Suttles Olvera. Appellant challenged Olvera based on his responses to several questions concerning the burden of proof and the presumption of innocence relevant to special issue number two. Article 37.-071(b)(2), V.A.C.C.P. Appellant contends Olvera would require proof that he is *not* a continuing threat to society.

In discussing future dangerousness, Olvera stated initially that it would "take a lot of proof to convince me otherwise that somebody convicted of a crime that's punishable by capital punishment would not be a continuing threat to society." At this point defense counsel set out to question Olvera's feelings on who should carry this burden of proof:

> "Q: Now would you require the defendant to prove to you that he would not be a continuing threat to society before you would answer No to that question?

THE PANELIST: You are saying, in other words, if they find lesser evidence, that I will agree?
THE COURT: No, no. In other words, if I put in the charge, if I ask you to find that he did not commit capital murder, but that he committed something else, and if the evidence shows that he did not commit capital murder, can you consider the other?
THE PANELIST: What he did?
THE COURT: Yes.
THE PANELIST: I do agree with that.
THE COURT: She apparently didn't understand your question.
　Do you understand what I am saying?
THE PANELIST: Yes, sir."

A: Yes, sir.

Q: Would you require him to prove to you beyond a reasonable doubt?

A: Yes, sir."

The trial court then intervened:

"THE COURT: Well, you would require the State to prove it beyond a reasonable doubt that he is going to be?

THE PANELIST: Yes sir.

THE COURT: That's the point. He doesn't have to prove anything. Do you understand that Mr. Olvera?

THE PANELIST: I understand.

THE COURT: The State has to prove that he is going to be a continuing threat to society.

THE PANELIST: Okay.

THE COURT: There is a difference. He doesn't have to prove that he is not going to be. The State has to prove that he is.

Do you understand what I'm saying?

THE PANELIST: Yes, sir.

CONTINUATION BY [DEFENSE COUNSEL]:

Q: And this is where you would want to hear from the defendant, I take it, in a situation like this? I remember you talking earlier about it, and we're explaining to you that at the trial of the case on the guilt-innocence we don't have to say anything.

A: Uh-Huh.

THE COURT: Still doesn't have to say anything at any time.

THE PANELIST: Okay.

CONTINUATION BY [DEFENSE COUNSEL]:

Q: And what you are telling me now is that this is where you need to hear from the defendant, and that is, to show to you that he is not going to be a continuing threat to society, because if he has been convicted of an intentional and deliberate murder, and you believe that he will be a continuing threat to society?

A: Only going by the facts that the State presents.

Q: Right. Now would you require the defendant, like I said earlier, the defendant to prove to you beyond a reasonable doubt that he wouldn't be a continuing threat to society?

A: Well, the State is the one that has to prove that he will be a continuing threat.

Q: So are you telling me now that you wouldn't require the defendant to prove anything?

A: No, sir. They would be the ones to prove that he would be a continuing threat to society.

THE COURT: In other words, you realize that the defendant doesn't have to do anything?

THE PANELIST: Yes, sir.

THE COURT: So you are not going to require the defendant to prove it?

THE PANELIST: No, sir. No, I understand that. I would only have to go by what the State presents."

Appellant then asserted a challenge for cause based on Olvera's initial answer that he would require the defense to prove beyond a reasonable doubt that he is not a continuing threat to society. The trial court overruled this challenge, stating that Olvera had misunderstood defense counsel's initial questioning, but his later responses qualified him as a juror. In fact, prior to ruling on the challenge, the trial court further questioned Olvera, who stated he had misunderstood the initial questioning; that he would not require anything of the defendant but would hold the State to its burden of proving the defendant was a continuing threat to society. The defense excused Olvera with a peremptory challenge.

■ Our review of the entire voir dire examination of Olvera reveals seemingly vacillating responses. Initially, he indicated that he would require the defendant to prove he was not a continuing threat to society. However, after further explanation and questioning by the trial court and defense counsel he changed his position, responding that he would not require anything of the defendant and would require the State to come forward with evidence sufficient to carry its burden of proving the second special issue should be answered affirmatively. When confronted with a

cold record and the vacillating responses of a venireman, we afford great deference to the decision of the trial judge. *Perillo v. State,* supra at 577. On this record, it cannot be said that the judge's refusal to excuse Olvera was an abuse of discretion. Appellant's point of error number six is overruled.

■ Appellant's seventh and eighth points of error allege the trial court erred in denying his challenges for cause against veniremen Kathleen Legg and George Mercer. Appellant challenged both Legg and Mercer based upon their responses to questions concerning the presumption of innocence. Specifically, he contends that both were the proper subject of a challenge for cause in that they would require the defendant to prove he is not guilty. Additionally, appellant challenged Mercer on the basis that he felt an indictment was some evidence of guilt.

During the initial examination of these veniremen, the prosecutor discussed and explained several general legal principles concerning the presumption of innocence; specifically, that an accused does not have to testify and that an indictment is not evidence of guilt of an accused. Both Legg and Mercer expressed an understanding of these concepts. Legg further stated that should she serve in this case, she would afford the defendant the benefit of both these principles. Additionally, both Legg and Mercer apparently understood the State carries the burden of proving the defendant's guilt beyond a reasonable doubt. However, when examined by defense counsel both venirepersons appeared to contradict their earlier statements.

Through a series of questions, Legg stated she felt that appellant "may be not guilty, but he's not necessarily innocent." [4] Following appellant's challenge for cause, the court questioned Legg as follows:

"THE COURT: Do you understand the question, ma'am?

THE PANELIST: I believe I do. Or maybe it's ambiguous. I'm sorry.

THE COURT: Well, no, we start off with the presumption of a person's—

THE PANELIST: Right, a presumption of innocence. Correct.

THE COURT: You just finished telling him that you presumed he was not necessarily innocent.

THE PANELIST: I'm sorry. I didn't mean that. I would presume him to be innocent, but there was some credibility to the indictment that brought him here. But, no, there is a presumption of innocence on my part on behalf of Mr. Satterwhite.

THE COURT: Do you want to continue asking her?

MR. SCHARMEN: Well, I think she also said, Your Honor, that there is some credibility to the indictment.

THE COURT: What do you mean, 'Some credibility to the indictment'?

THE PANELIST: Well, you don't just go out and indict people without reason to indict them; do you? Our system doesn't do that.

THE COURT: Well, an indictment is not evidence of guilt, ma'am, and it's not evidence of guilt when a defendant is presumed to be innocent. The indictment is the result of the meeting of the Grand Jury that determines that a case

4. Appellant's challenge for cause against Legg stems from the following exchange with defense counsel:

"Q: Now do you feel as though, because Mr. Satterwhite is here in court today, that he must have done something wrong?
A: Not necessarily.
Q: A lot of people might have the feeling that a person may be not guilty, but they are not necessarily innocent. Do you make that kind of distinction?
A: Would you repeat that, please?
Q: A lot of people have the feeling that a person may be not guilty, but they are not

necessarily innocent. Do you make that kind of distinction?
A: Yes.
Q: Do you make that distinction in Mr. Satterwhite's case.
A: I believe so, yes.
Q: So by that I mean do you feel like he may be not guilty, but he's not necessarily innocent?
A: That's true."
At this point, defense counsel challenged Legg for cause.

should be brought to trial. It has nothing to do with guilt.

Do you understand that?

THE PANELIST: Right. I understand it has nothing to do with guilt. Yes, I understand.

THE COURT: You see, the way you answered his questions I wasn't certain that you understood, and that's the reason why I tried to caution you—not you, but caution the prospective jurors to listen very intently before they make a response.

I'm not implying these lawyers are tricky. It's just that they make statements, and sometimes you misunderstand what they say.

But I think we need to find out whether you think at this very moment that Mr. Satterwhite is not necessarily innocent. Is that what you are saying?

THE PANELIST: No. As far as I'm concerned, Mr. Satterwhite is completely innocent, and it will be up to the State to prove to me otherwise."

Again appellant asserted his challenge, which was denied by the trial court.

When Mercer was questioned by the defense he also expressed some difficulty with the concept that an indictment is not any evidence of guilt. The relevant portions of Mercer's voir dire examination are set out below.

"QUESTIONING BY DEFENSE COUNSEL:

Q: Now a lot of people sort of feel like where there is smoke there is fire, you know, and that if a grand jury has issued an indictment against somebody, well, he must have done something wrong or he wouldn't be here.

Do you sort of feel that way?

A: Well, I feel it must be pretty important that they done—they issued an indictment. I mean they have to have a certain amount of evidence, I understand.

Q: Uh-huh. And the question that I'm asking you, sir, is that if an individual has been indicted, does that mean that, in your mind, they must have done

something wrong or they wouldn't have been indicted in the first place?

A: Yes, sir.

\* \* \* \* \* \*

Q: Okay, is that indictment, to your way of thinking, some evidence of wrongdoing?

A: Well, it's some evidence. But as to just how strong the evidence it would be, I mean would have to be decided.

Q: By the jury?

A: Yes, sir.

Q: Well, I understand that. And I am just saying that in your way of thinking then, the indictment is some evidence of guilt?

A: Well, I don't know what you would call it if it wasn't something. I mean they don't just go out and arrest somebody, you know, for no reason at all.

Q: Uh-huh.

A: But as far as a man being indicted, I wouldn't, in my eyes—I would try to keep an open mind as far as before I would pronounce him guilty.

Q: Right. I understand that.

A: I mean—

Q: But you are saying, I think Mr. Mercer, that insofar as that indictment has been issued, that that is some evidence of wrongdoing, of guilt?

A: Well, I guess it would have to be a certain percent."

The prosecutor then objected on the grounds that defense counsel was suggesting answers, twisting words and not allowing the juror to answer the questions for himself. The trial court began questioning Mercer. His responses show that he was confusing the idea that an indictment cannot be considered evidence of guilt and the fact that in order to get an indictment someone must have come forward and presented some sort of evidence to the grand jury. Ultimately, the trial court set out to clear up the misunderstanding:

"THE COURT: Mr. Mercer, do you remember I told you that an indictment is a method by which a case, any case, is brought to trial, like a pleading in a civil suit?

I can file a suit against you saying that you owe me some money, but you may not owe me any money. So do you think that that's any evidence that you owe me money because I file a petition?

THE PANELIST: No, sir.

THE COURT: Well, that's the same thing with a grand jury.

THE PANELIST: But somebody believed you to issue a warrant.

THE COURT: No, I may have gone to the District Attorney's office saying you stole my bicycle, and you weren't even around. But I said that you did. And so the grand jury issues an indictment for this theft, or whatever. That doesn't mean that you have done anything; does it?

Do you understand what I am saying?

THE PANELIST: They are going to believe you.

THE COURT: Well, they may not believe me, but they think this is the kind of case that ought to be brought to trial. That's why we are hear [sic], to see if there has been any wrongdoing.

Do you understand that?

THE PANELIST: Yes, sir.

THE COURT: Does that make sense to you?

THE PANELIST: Yes, sir, it does.

\*　\*　\*　\*　\*　\*

THE COURT: Do you not believe that this man is presumed to be innocent at this very moment?

THE PANELIST: Yes, sir. I believe that he's presumed to be innocent.

THE COURT: Okay. Do you believe that an indictment is not evidence of guilt?

THE PANELIST: Yes, sir. I believe that."

The prosecutor continued explaining these principles using the trial court's example of stealing the bicycle and Mercer expressed his understanding of the concept that an indictment is not any evidence of guilt, *viz:* "I just had to have some kind of example to show me. I'm not that experienced in such as this." Upon further questioning by defense counsel, Mercer again stated that he presumed appellant to be innocent and he understood the indictment was not evidence of guilt.

Appellant also challenges Mercer on the grounds that he would require the defendant to testify. Again, when initially questioned by the prosecutor, Mercer stated he understood an accused does not have to testify. He also acknowledged that should the defendant in this case not testify, he, as a juror in the case, would be instructed by the trial court not to consider this in his deliberations. Appellant asserts that Mercer changed his position in later questions and revealed he would require the defendant to testify to prove he is not guilty. Appellant bases his challenge on a series of questions which defense counsel phrased in very general terms. In the questioning defense counsel referred to "taking the fifth" with little or no explanation. It is apparent from the questions and Mercer's responses that he did not fully understand what "the fifth" referred to and needed more explanation.[5] With further explanation, Mercer stated he would not hold it against an accused that he did not testify.

Based on the voir dire examination above, appellant challenged both Legg and Mercer. In support of his challenges, appellant cites *Montoya v. State*, 810 S.W.2d 160 (Tex.Cr.App.1989), for the proposition that a defendant may remove venirepersons who cannot afford him his right against self-incrimination. *Id.* at 173. While this is no doubt true, in applying this principle the *Montoya* Court observed that although the venireperson in question "admitted she would wonder why a defendant would not testify in his own behalf, ... when she was pinned down ... she clearly testified that she could follow the court's instruction" and not consider the defendant's failure to testify when making a determination of guilt. *Id.* at 173. Therefore, we held, the trial court did not err in

---

**5.** In fact, Mercer said he did not have much experience with the fifth amendment and without further explanation or example his first responses were based on his understanding that "the fifth" was something often used by "gangsters" to try and hide something.

overruling defense counsel's challenge to this particular venireman. Similarly, in the instant case, while both Legg and Mercer may have hedged in their responses to questions concerning the presumption of innocence and self-incrimination, both stated they presumed appellant to be innocent and would follow the trial court's instruction and not consider the indictment to be any evidence of guilt. Thus, the record supports the decisions of the trial judge. *Perillo,* supra. Appellant's seventh and eighth points of error are overruled.

In his ninth, tenth, and eleventh points of error appellant alleges error which occurred in the third and final competency hearing in which a jury found him competent to stand trial.[6] In points nine and ten appellant contends the prosecuting attorney peremptorily struck two black venirepersons for racially discriminatory reasons in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Assuming that the prohibition of *Batson* applies to the selection of a jury for a competency hearing, we find appellant's contentions without merit.[7]

■ In order to invoke the protections set forth in *Batson,* appellant must first raise an inference of purposeful discrimination through the State's use of its peremptory strikes. Once appellant has established such purposeful discrimination, the burden of production shifts to the prosecutor to come forward with racially neutral explanations for the strikes. Once the prosecutor has articulated racially neutral explanations, the burden shifts back to the defendant to persuade the trial court that the "neutral explanation" for the strike is really a pretext for discrimination.

*Williams v. State,* 804 S.W.2d 95, 101 (Tex. Cr.App.1991); *Whitsey v. State,* 796 S.W.2d 707, 726 (Tex.Cr.App.1989) (opinion on State's motion for rehearing). This Court will reverse the trial court's resolution of a *Batson* issue only if the court's findings are found to be clearly erroneous. *Id.* Our review of the record shows the trial court's denial of appellant's *Batson* claim was not clearly erroneous.

■ After the questioning of the panel but before the swearing of the jury, the trial court held a *Batson* hearing. From this hearing we are able to discern that the jury panel consisted of thirty persons, three of whom were black. Each side was afforded six peremptory challenges and at the conclusion of the voir dire both the prosecution and the defense exhausted their peremptory strikes. Two of the prosecutor's six strikes were used on black panelists. Although, one black person actually served on the jury. In fact, this black member of the panel was selected to serve on the jury before any black venireperson was struck.

At this hearing, the prosecutor stated his reasons for excluding the two black venirepersons in question. Not surprisingly, the prosecutor's stated reasons were not racially motivated. The prosecutor struck prospective juror Mays because she failed to fully complete her juror information card. Apparently she had previously served on both a civil and a criminal jury, but she did not mark this on her card. The prosecutor felt Mays was unsure of herself and would not be a good juror in this case. Likewise, the prosecutor struck Hodge because he had previously served on a jury for some

---

6. Prior to trial on the merits, defense counsel requested the trial court to evaluate appellant's competency to stand trial pursuant to Article 46.02, V.A.C.C.P. Altogether, three competency hearings were held. The first two hearings were declared mistrials due to the juries' inability to reach unanimous verdicts.

7. In several recent decisions, the United States Supreme Court has reaffirmed and extended the prohibition against racial discrimination in jury selection stemming from *Batson.* The Court has held that such discrimination in both a private civil litigant's, and most recently, a criminal

defendant's use of peremptory challenges violates the Equal Protection Clause. *Edmonson v. Leesville Concrete,* 500 U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); *Georgia v. McCollum,* 505 U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). Inasmuch as it is the equal protection rights of the individual venirepersons which are harmed by racial discrimination in the exercise of peremptory challenges, a *Batson* claim appears to be cognizable under any setting wherein a jury is being selected, including a competency hearing. See *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

sort of competency hearing. He too was "unsure of himself," not clearly remembering when and where he had previously served. The prosecutor felt that his prior service in a similar hearing might influence him in some way; therefore, he considered him to be an unacceptable juror. Once the prosecutor gave his racially neutral explanations for the peremptory challenges, the burden shifted ultimately to appellant to persuade the court the strikes were in fact racially motivated. This appellant failed to do.

After the prosecutor proffered his reasons, appellant did not cross-examine him, nor did he offer any evidence of his own showing an impermissible motive for the peremptory challenges in question. Rather than question the credibility of the prosecutor's explanation, defense counsel merely stated these explanations were "insufficient." At this point, the trial court denied appellant's *Batson* challenge. Appellant makes no argument from the record, nor do we find any reason why the trial court could not accept the prosecutor's racially neutral explanations at face value. Appellant has failed to carry his burden of showing racial discrimination on behalf of the prosecution. On such a record, we cannot say that the decision of the trial court in overruling appellant's objection to the State's peremptory challenges was clearly erroneous. Accordingly, appellant's ninth and tenth points of error are overruled.

■ In his eleventh point of error appellant contends the trial court erred in overruling his objection to manifestly improper jury argument of the prosecutor during the competency hearing. Appellant argues that the comments of the prosecutor were an impermissible attack upon him through his counsel, and thus, a violation of his right to effective assistance of counsel. The jury argument at issue occurred at the conclusion of the third competency hearing and was as follows:

"PROSECUTOR: You are the exclusive judges of the facts in this case and the credibility of the witnesses. That's your job.

The issue is competence to stand trial. That's the issue. And they have the burden to prove to you that he is incompetent. And how have they met that burden?

They have put on one of themselves, one of the Defense attorneys. And they put on Dr. Tilles. That's who they called.

Now they are going to tell you that we put on our own witnesses, our witnesses versus their witnesses. That's not true. They have the burden.

Let's look at the witnesses that they put on. First of all, they put on Mr. Callahan. I'm not telling you he is a liar, but that's for you to decide. And where—

MR. SCHARMAN: Your Honor, I have to object to that comment as striking at the defendant over the shoulders of his counsel against the Fifth and Sixth Amendments.

THE COURT: I overrule the objection. Ladies and gentlemen, you are to consider all the evidence. And you are the judges of the credibility of the witnesses. You can believe everything that a witness says, part of what a witness says, or nothing of what a witness says.

You may proceed.

PROSECUTOR: When Mr. Scharman was questioning Mr. Callahan, he said, 'Who would be a better judge of whether or not the Defendant can communicate with his attorneys than the attorneys who are communicating with him?'

Use you common sense, ladies and gentlemen. If they were the ones to present that evidence, and they are the best evidence of that, or the best presenter of that type of evidence, then every Defense attorney would come in, take the stand, and say that 'I cannot communicate with my client; therefore, he is incompetent; therefore he cannot stand trial.' "

Appellant relies on such cases as *Gomez v. State*, 704 S.W.2d 770 (Tex.Cr.App.1985) ("We are not paid to satisfy Pat Abeyta, or anyone else that he drags down here to manufacture evidence."), and *Fuentes v.*

*State,* 664 S.W.2d 333 (Tex.Cr.App.1984) ("I don't know that the Court has the time to give Mr. Ethics—Mr. Teter a crash course in evidence but we are going to object to what was read in the newspaper or anything else."), for the proposition that inflammatory argument which impugns the integrity of defense counsel has been repeatedly condemned by this Court. This is true; yet there is a significant difference between the arguments in the above cited cases and that which took place in this case. Here, Callahan, co-counsel for the defense, was called as a witness for the appellant, and testified in the presence of the jury on the issue of appellant's competency. The prosecutor's comments were directed at the veracity of Callahan, the witness, not at his role as counsel for the defense. A prosecutor is allowed to argue that the witnesses for the defense are not worthy of belief. Callahan testified on behalf of the appellant as to the only contested issue at the hearing. Having done so, his credibility as a witness became an issue and was the proper subject of comment by the prosecutor. We perceive no error. Point of error eleven is overruled.

█ In two related points of error appellant claims that the trial court erred in refusing to submit to the jury at the punishment phase of his trial his specially requested charge on mitigating evidence. At the conclusion of the punishment phase, appellant's counsel objected to the court's charge, asserting that it "did not go far enough to be in compliance" with *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Appellant further requested a charge discussing mitigation and providing an additional special issue by which the jury would have been able to consider all the mitigating evidence and expressly indicate whether death was the appropriate punishment in this case. The trial court refused this instruction and in-stead relied upon an instruction of its own reminiscent of one we recently found to be "a clumsy attempt at jury nullification." *See Rios v. State,* 846 S.W.2d 310, 316 (Tex.Cr.App.1992, rehearing denied December 9, 1992). Appellant contends that the additional special issue was necessary because the statutory special issues did not allow the jury to give full consideration and effect to evidence that mitigates against giving the death penalty; therefore, Article 37.071, V.A.C.C.P., was unconstitutional as it applied to him.[8] Without having to decide the adequacy of either the trial court's instruction or appellant's requested special issue, we hold that on this record appellant has not presented any mitigating evidence which has relevance to appellant's moral culpability beyond the scope of the special issues.

█ After *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), and *Penry,* it is clear the Texas capital sentencing scheme can be applied in a manner consistent with the Eighth Amendment. It is also clear from *Franklin* and the subsequent holdings of this Court that evidence with mitigating value in the sense that it only tends to show that one of the special issues should be answered in the negative can be fully considered and given effect by the jury in the context of those special issues without a need to further instruct the jury regarding that evidence. See, e.g., *James v. State,* 805 S.W.2d 415, 417, n. 3 (Tex.Cr.App. 1990); *Quinones v. State,* 592 S.W.2d 933 (Tex.Cr.App.1980). Only in particular capital cases when evidence is proffered which is relevant as mitigating evidence, but its mitigating significance is either quite apart from, or goes beyond, any bearing it has on one of the statutory special issues are the Eighth Amendment protections of *Penry* implicated. Under these circumstances, a

---

**8.** At the close of the evidence at the punishment phase of trial, the trial court submitted the following issues to the jury:

"(1) whether the conduct of the defendant was committed deliberately and with the reasonable expectation that the death of the deceased or another would result; and

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

As per Article 37.071, supra, a "no" response to either of the special issues would result in the trial judge imposing a sentence of life imprisonment rather than the death penalty.

sentence of death will be invalid if the trial court fails to provide the jury with some mechanism by which to account for this mitigating evidence, and, in its reasoned moral response, assess a less severe punishment. This is the essence of the Supreme Court's holding in *Penry*.

Whether or not the protections required by *Penry* have been adequately provided for depends upon the circumstances of each individual case. *Lewis v. State*, 815 S.W.2d 560 (Tex.Cr.App.1991). Additionally, whether or not the protections of *Penry* are required at all depends on whether evidence was presented to the jury which was shown to have a tendency to reduce the moral culpability of the capital defendant in a way not exclusively related to the special issues. In the instant case, we find that it was not.

■ In his brief appellant cites as *Penry* evidence certain testimony presented at the punishment phase of his trial. Appellant argues that evidence concerning his disadvantaged childhood including inadequate parenting as a child, the absence of a father, an alcoholic mother, and poverty, as well as a full scale IQ of 74 and a below average academic ability "diminished his moral culpability" and thus necessitated an additional special instruction on mitigation. However, in light of this Court's recent caselaw, such evidence of a disadvantaged background and limited intellectual and mental capability can be fully considered and given effect by the jury in the context of the special issues without any further instruction. See, e.g. *Draughon v. State*, 831 S.W.2d 331, at 339 (Tex.Cr.App.1992); *Lackey v. State*, 819 S.W.2d 111 (Tex.Cr. App.1991).

■ Additionally, appellant cites evidence of mental illness or personality disor-

der at the time of the offense, and that he voluntarily sought treatment for his mental problems as an adult, as warranting Penry instructions. The record on appeal fails to disclose how this evidence is relevant to appellant's moral culpability for the instant offense beyond the scope of the special issues. Therefore, applying the principles developed by this Court in several recent decisions, we conclude appellant has not presented evidence which entitles him to an additional special instruction under *Penry*.

■ The only testimony concerning appellant's mental status was presented and developed during the punishment phase of the trial.[9] The first expert to testify was Dr. Jerome Tilles, M.D., a board certified psychiatrist. Testifying on behalf of the appellant, Tilles stated that he had spent some nineteen hours interviewing and reviewing appellant's past penal, medical, psychiatric and psychological records. From the interviews and the records, he concluded that appellant had a history of symptoms, including periodic delusions, hallucinations and other "psychotic behavior" that suggested mental illness. Based upon this history and the fact that between 1984 and 1986, while at the penitentiary, appellant sought treatment and in fact was treated for an unspecified mental illness, Tilles diagnosed appellant as a chronic paranoid schizophrenic.[10]

In rebuttal, the State presented testimony from two expert witnesses. The first was Dr. John C. Sparks, a board certified psychiatrist who is currently the director of the Medical/Psychiatric Department of the Bexar County Detention Center. Sparks was appointed by the trial court on August 2, 1989, to examine the appellant to determine his competency to stand trial. Sparks

---

**9.** Prior to trial, appellant was granted a competency hearing. Two separate juries deadlocked on the issue and the hearings ended in mistrials. A third jury rejected appellant's claim of incompetency. See n. 6, *ante*. Because the competency hearing was tried to a different jury, we limit our review to the evidence heard by the jury on the trial of the merits.

**10.** Chronic paranoid schizophrenia was generally described as a long-term psychotic mental

illness which impairs a person's thinking, feelings and behavior. Tilles testified that appellant has periodic episodes during which he is unable to explain what he is thinking or what he is doing. "When he is sick," he experiences the world in a "very intense, sharp and painful way," and his behavior, including some aggression and violence, is sometimes based on the misperception "that other people have evil intentions toward him."

interviewed appellant for fifty minutes and "found him to be coherent, logical, oriented. He knew where he was, who I was, and he made sense." Sparks found appellant to be competent and "felt he showed no signs of mental illness at that time." Based upon this examination and his review of the records concerning appellant, Sparks concluded appellant "has a paranoid personality disorder. He does not have a mental illness, in the sense that he has a chronic illness that has existed for more than six months, or more than two years of consistent time." Sparks attributed appellant's prior episodes of hallucinating and psychotic behavior to the fact that they took place at times when he was in "relative isolation." Once treated or removed from isolation, the episodes ceased. Sparks strongly disagreed with Dr. Tilles diagnosis of chronic paranoid schizophrenia.

The State's second expert witness was Dr. William Mack Erwin, a clinical psychologist, who interviewed and tested appellant. Erwin diagnosed appellant primarily as a mixed personality with some underlying psychotic features, a diagnosis different from chronic paranoid schizophrenia. He described appellant's psychological testing as suggestive of low impulse control, general identity problems, impaired judgment, and anti-social features including a tendency to act out his anger.

The vast majority of the expert testimony concerned appellant's mental status at the time of trial or in the years since 1984, but not at the time of the instant offense in 1979. The only testimony raising an inference as to appellant's mental status at the time of the offense was that of Dr. Tilles. However, by his own admission, Tilles said it would be impossible for him to say whether appellant was schizophrenic prior to 1984.[11] He could opine only that appellant had "some mental illness" prior to 1984. Also, from what we can discern from Tilles' testimony, the effects of chronic paranoid schizophrenia appear to be episodic. The delusions, hallucinations and aggression appear to come and go. Nowhere in the record is there any evidence that at the time of the instant offense appellant was suffering from paranoid schizophrenia, or, for that matter, a paranoid personality disorder; or, if he was, whether he was in the throes of any such psychotic episode. In all the testimony, there was never any evidence or opinion as to appellant's mental status at the time of the instant offense, nor any evidence explaining any connection between appellant's current mental illness and the facts and circumstances of his criminal acts in this case.

Recently, several decisions of this Court have required as a condition of reversal on the basis of *Penry* error "some testimony indicating a nexus between [the accused's] ... circumstance and the commission of the crime ... indicative of a lessened moral blameworthiness." *Nobles v. State*, 843 S.W.2d 503 (Tex.Cr.App. rehearing denied 1992). See also *Goss v. State*, 826 S.W.2d 162 (Tex.Cr.App.1992) (plurality opinion); *Lackey v. State*, supra. Basically, in order for mitigating evidence to have relevance beyond the scope of the special issues, there must be a "nexus between the mitigating evidence and the circumstances surrounding the crime that might, from the viewpoint of society, reduce the defendant's 'deathworthiness.' In other words, the evidence must tend to excuse or explain the criminal act, so as to make that particular defendant not deserving of death." *Goss*, supra at 165. If the evidence at trial is not shown to have such a tendency to

---

11. When asked his opinion of how long appellant has been mentally ill with paranoid schizophrenia, Tilles responded:

"[he] had a mental illness as a teenager, and the first acute psychiatric illness that we have is in 1984. Whether he had schizophrenia before that would be hard for me to diagnose with the information I have. It's certain that he had a mental illness. The nature or character of it is not very clear....

I think what may be stated is that his experience of the world, the intense feeling states that he has which throw him off balance with minimum stress, has been going on for some time. And that is the disability, that goes way back. Whether that could have been formally diagnosed before 1984 I am not clear."

excuse or explain the criminal acts of the appellant, then that evidence is not relevant beyond the scope of the special issues and no additional special instruction is necessary.

Applying the principles above to the case at bar, it cannot be said that the evidence of appellant's recent mental health has mitigating relevance beyond the scope of the special issues. None of the evidence presented at trial attempted to explain the connection between appellant's mental illness and the instant offense. Appellant made no showing that his current diagnosis of mental illness somehow specifically reduced his blameworthiness for the 1979 robbery and murder of Mary Davis in a way that could not be adequately addressed through the special issues which were submitted to the jury.[12] Absent such a showing, the protections of *Penry* are not required, no special instruction was warranted, and we cannot conclude that appellant has been sentenced to death in contravention of the Eighth Amendment. See *Gribble v. State*, 808 S.W.2d 65 (Tex.Cr. App.1990). Appellant's twelfth and thirteenth points of error are overruled.

■ Appellant's fourteenth point of error asserts the trial court erred in denying his motion to quash the indictment.[13] Appellant sought to quash the indictment on the grounds that Article 37.071, supra, unconstitutionally "chilled" his ability to present all mitigating evidence to the jury in violation of the Eighth and Fourteenth Amendments. Appellant argues that he could not reasonably further develop and present evidence of his troubled youth, poor family background and minority status because the narrow special issues at

the punishment phase only permitted the jury to consider this mitigating evidence as aggravating. Such an argument might be appropriate in a pre-*Penry* case. However, the present case was tried in July 1989, a month after *Penry* was handed down. After *Penry* it is clear that should a capital defendant produce mitigating evidence not exclusively related to the special issues he is entitled to an instruction to which the jury could respond with a life sentence. Nowhere in the record is it shown that appellant was prevented by the trial court from putting on such evidence. Under these circumstances, it cannot be said that Article 37.071 "chilled" appellant's presentation of evidence. This point of error is overruled.

■ In his fifteenth point of error appellant contends the trial court erred in overruling his objection to testimony concerning an in-court identification of appellant as having been present in the food store on the morning of the robbery and murder. Appellant argues that Kenneth Rodriguez's in-court identification of appellant was tainted by an impermissibly suggestive pre-trial photographic lineup shown by Officer Authur Trevino of the San Antonio Police Department, and thus violated appellant's right to due process.

At trial the jury heard testimony from both Rodriguez and Trevino concerning the pretrial photographic lineup. Rodriguez testified that on the morning of March 12, 1979, he entered the Lone Star Ice & Food Store No. 18. Inside the store he noticed a black couple speaking to the cashier. Rodriguez purchased some ice cream and went on his way. Later that day he heard a news report of the robbery and murder at

---

12. In fact appellant offered and argued this mitigating evidence as tending to show that the answers to the statutory special issues submitted to the jury should be answered in the negative. Specifically, he argued that due to his mental illness appellant's behavior would be impulsive and therefore not deliberate, and that with continued treatment with anti-psychotic medication appellant's behavior could be controlled such that he would no longer be a continuing threat to society.

13. Initially, the State argues this point of error was not properly preserved for review because appellant's "Motion To Quash Indictment" was not timely filed. Without addressing whether a challenge of this sort needs to be preserved for review, we note that the State's argument was based on the erroneous fact that the motion was filed July 28, 1989, four days after jury selection had begun. The record shows that the motion was filed July 18, 1989, seven days prior to the commencement of jury selection, and was heard by the court on August 14, 1989, before the jury was sworn.

the store. He contacted Officer Trevino, stating that he had been in the store that morning and may have seen the perpetrators of the crime. The following day Rodriguez met with Trevino and gave him a statement. Trevino did not contact Rodriguez again until March 16. In the meantime, Sharon Bell had been arrested and subsequently gave a confession implicating herself and appellant, *John T.* Satterwhite, in the robbery and murder of Mary Davis. In the confession Bell named *"Bobby* Satterwhite" as the man having committed the robbery and murder. At the same time, however, Bell selected a photograph of *John T.* Satterwhite out of a group of photographs and identified him as the perpetrator. Later testimony confirmed that at the time of the robbery and murder the appellant, *John T.* Satterwhite, was carrying a temporary drivers license in the name of his brother, *Bobby* Satterwhite, and had been using this alias. Bell stated that it was for this reason she named "Bobby" as having committed the offense. Based on Bell's selection of appellant's photograph, the police developed another photographic lineup to show Rodriguez. On March 16, 1979, Rodriguez positively identified the photograph of *John T.* Satterwhite, appellant, as the man he saw in the Lone Star Food Store on the morning of March 12. He signed and dated the back of the photograph and later identified appellant in-court at his first trial for this offense.

In 1989, ten years later, Rodriguez could not positively identify appellant as the man in the store on March 12, 1979. The State sought to introduce testimony concerning his earlier identification of appellant. Officer Trevino testified that he handed Rodriguez a group six photographs including the photograph of *John T.* Satterwhite. The photographs were of men of the same race, of similar ages, and more or less similar in appearance. He testified that there was nothing impermissibly suggestive about the lineup and Rodriguez immediately identified the photograph of *John T.* Satterwhite as the man he had seen in the store.

Appellant now argues that the initial photographic lineup was impermissibly suggestive in that it did not include a photograph of Bobby Satterwhite. He contends that at the time Rodriguez saw the lineup Sharon Bell had identified Bobby Satterwhite, not John Satterwhite, as the perpetrator of the robbery and murder. Therefore, Rodriguez should have been shown Bobby's photograph as opposed to or in addition to appellant's. Since the brothers look very similar, and no photograph of Bobby was included, Rodriguez could only identify the individual in the photographs who most closely resembled Bobby, that being his brother John. This created an impermissibly suggestive pretrial identification which tainted the later in-court identification.

We find appellant's allegation to be meritless. The photograph of appellant was included in the photo array shown to Rodriguez because it was selected from another series of photographs by appellant's accomplice in the robbery, not because of the name of the individual in the photograph. Bell identified the photograph of appellant as that of the man who robbed and murdered Davis. Rodriguez identified appellant as the man he saw in the store on the morning of the offense. There was no testimony suggesting that Officer Trevino acted improperly in showing the photographs to Rodriguez. The mere fact that a particular photograph was not included in the array does not make the photographs that were included in the array somehow suggestive. Appellant could have confronted the witnesses at trial with a photograph of "Bobby" and made his argument to the jury. Appellant's contentions go more to the credibility of Rodriguez's identification of appellant than to the admissibility of the identification. Appellant's fifteenth point of error is overruled.

 Point of error sixteen alleges the trial court erred in denying appellant's motion to suppress certain evidence recovered as a result of an automobile search. Appellant argues that the seizure of a .22 caliber pistol, later shown to be the murder weapon, violated the Fourth Amendment because the search of the vehicle was conducted without a warrant and without probable cause to believe that a felony or

**430**

breach of the peace had been committed. This Court decided this exact same issue adversely to appellant in *Satterwhite v. State*, 726 S.W.2d 81 (Tex.Cr.App.1986), rev'd in part, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). There we concluded that the "search of the vehicle was a search incident to arrest and was therefore lawful." *Id.* at 87. Under the legal principle of "the law of the case" our resolution of this question of law in appellant's previous appeal of this same case will govern the disposition of this issue in his present appeal. *Harris v. State*, 790 S.W.2d 568 (Tex.Cr.App.1989); *Ware v. State*, 736 S.W.2d 700 (Tex.Cr.App.1987). None of the facts surrounding the search in dispute have changed since this Court ruled on the legality of the search during appellant's first appeal. Therefore, appellant's sixteenth point of error is overruled.

Appellant's final point of error alleges the trial court erred in instructing the jury with an erroneous definition of the term "deliberately" as that term is used in Article 37.071, supra. The trial court instructed the jury:

> "As employed in the first Special Issue, the word 'deliberately' has a meaning different and distinct from the word 'intentionally' as that word was previously defined in the charge of guilt.
>
> The term 'deliberately' as used in the first Special Issue is defined as with careful consideration or deliberation; with full intent; not hastily or carelessly—as a deliberately formed purpose; with awareness of the consequences."

At trial, appellant objected to this definition because "it does not comport with what the majority of the Court of Criminal Appeals suggests for the definition." The trial court overruled this objection and refused appellant's requested instruction. In his brief appellant now argues that the definition as submitted confused the distinction between "deliberate" and "intentional" because it used the words "with ... intent" to define "deliberate." The State argues that appellant has failed to preserve any such error in the trial court's definition, and we agree. Appellant's trial objection in no way specifically alerted the trial

judge to the alleged error he urges on appeal. He has therefore failed to preserve error. Tex.R.App.Proc., Rule 52(a). Appellant's final point of error is overruled.

Finding no error, we affirm the judgment of the trial court.

MALONEY, J., concurs as to points of error 12 and 13 and otherwise joins the opinion.

WHITE, J., not participating.