

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-13-00039-CR

---

BILLY JAY BURRIS, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 24635

---

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

Billy Jay Burris and two others with him were found in possession of a total of 7.2 grams of pseudoephedrine. As a result, Burris stands convicted by a Lamar County jury of conspiracy to manufacture methamphetamine in a quantity between one and four grams.[1] We affirm the trial court's judgment, because (1) no *Batson*[2] error has been demonstrated, (2) admitting the report of Burris' pseudoephedrine purchases was proper, (3) sufficient evidence established the quantity of methamphetamine to be manufactured, and (4) Burris' complaint about being committed to SAFP was not preserved.

*(1)     No Batson Error Has Been Demonstrated*

Burris claims the trial court erred in overruling his *Batson* challenges to the State's use of peremptory strikes on four veniremembers. Burris also complains about a fifth veniremember who was not struck; but Burris still claims the treatment of this veniremember is a *Batson* violation.

In *Batson*, the United States Supreme Court provided a three-step process for trial courts to use in adjudicating a claim that a peremptory challenge is based on racial discrimination. *Batson*, 476 U.S. at 96–98; *see also Snyder v. Louisiana*, 552 U.S. 472, 476–78 (2008); *Miller-El v. Cockrell*, 537 U.S. 322, 328–29 (2003); *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008). First, a defendant must make a prima facie showing that the peremptory challenge

---

[1]*See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(c) (West 2010); TEX. PENAL CODE ANN. § 15.02 (West 2011). Burris was sentenced to five years' confinement, probated.

[2]The use of a peremptory challenge to strike a potential juror because of race violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). It also violates Texas law. *See* TEX. CODE CRIM. PROC. ANN. art. 35.261 (West 2006).

has been exercised on the basis of racial discrimination. *Cockrell*, 537 U.S. at 328–29. Second, if the prima facie showing has been made, the State must offer a race-neutral explanation for the strike. *Id.* Third, the trial court must decide whether the defendant has shown purposeful racial discrimination. *Id.*; *Grant v. State*, 325 S.W.3d 655, 657 (Tex. Crim. App. 2010).

"'Pretext' is solely a question of fact; there is no issue of law." *See Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004). On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. *Snyder*, 552 U.S. at 477–78; *Watkins*, 245 S.W.3d at 448. The "critical question" in determining whether the opponent of a strike has proved "purposeful discrimination" is "the persuasiveness of the prosecutor's justification for his peremptory strike." *Cockrell*, 537 U.S. at 338–39. The State must "stand or fall on the plausibility of [its] reasons" for striking a juror. *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005). The State's proffer of a "pretextual explanation naturally gives rise to an inference of discriminatory intent." *Snyder*, 552 U.S. at 485. "[W]hen the State's explanation for striking a juror is clearly contrary to the evidence, . . . there is no innocent mistake," and the case must be reversed under *Batson*. *Greer v. State*, 310 S.W.3d 11, 16 (Tex. App.—Dallas 2009, no pet.).

Once a prosecutor gives a racially neutral explanation that supports adequately and legally a judgment in the State's favor, a fact issue arises which the trial court can resolve only by its assessment of evidentiary weight and credibility. *Tompkins v. State*, 774 S.W.2d 195, 202 (Tex. Crim. App. 1987). A defendant does not meet this burden just by disagreeing with the prosecutor's explanation for its strike. *Webb v. State*, 840 S.W.2d 543, 544 (Tex. App.—Dallas, 1992, no pet.). It is ultimately the defendant's burden to prove that the State excluded

3

veniremembers on the basis of race. *Yarborough v. State*, 947 S.W.2d 892, 906 (Tex. Crim. App. 1997).

Initially we point out that, while the parties referred to juror questionnaires during voir dire, no such cards or questionnaires are included in the record presented to this Court. It was incumbent on Burris to request the jury information cards or questionnaires be included in the record. *See Vargas v. State*, 838 S.W.2d 552, 556–57 (Tex. Crim. App. 1992). In the absence of a complete record, we presume the trial court found facts necessary to support its order. *Gaitan v. State*, 905 S.W.2d 703, 706 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd). The only record of the race of the five veniremembers of whom Burris complains is a statement by the defense attorney that the discussed persons were "black."

### *Harvey Attrell and Joseph Finch*

Burris made *Batson* challenges to the State's peremptory strikes of veniremember Harvey Attrell and Joseph Finch. The State gave the following explanation for its strike of Attrell:

> Your Honor, regarding Mr. Attrell, he's an older man. We were concerned that he was of an age group that would not really identify with and be able to appreciate the fact that this involves methamphetamine. . . . Mr. Attrell is an elderly person -- is older. We were concerned, not because he's elderly, but because he really did not respond to any of the questions about methamphetamine[,] about intent, about conspiracy. We were concerned about his ability to understand concepts.

Youth has been held to be a racially neutral reason for exercising a peremptory strike. *Moss v. State*, 790 S.W.2d 731, 732 (Tex. App.—Houston [14th Dist.] 1990, no pet.); *Rasco v. State*, 739 S.W.2d 437, 439 (Tex. App.—Houston [14th Dist.] 1987, pet. ref'd, untimely filed). By extension, lack of youth would appear to be a race-neutral reason for a peremptory strike. *See*

4

*James v. State*, No. 06-04-155-CR, 2005 Tex. App. LEXIS 9246, at *8 (Tex. App.—Texarkana Nov. 8, 2005, no pet.) (not designated for publication) ("Age may be a legitimate neutral reason for a peremptory challenge.")  However, the State's explanation "must be closely examined," lest "an attorney [] unintentionally find reasons other than race to strike a black veniremember when race was actually the motivating factor." *Chivers v. State*, 796 S.W.2d 539, 543 (Tex. App.—Dallas 1990, pet. ref'd).  In *Chivers*, the State struck a veniremember because he was thirty-five years of age, but did not explain to the trial court why the State found that age to be too young.  Additionally, the State compared the thirty-five year-old to another, white, veniremember who had also been struck; but that second venireman was ten years younger than the contested, African-American, juror.[3]  In contrast, here, the State explained that it was "concerned about [Mr. Attrell's] ability to understand the concepts" and his failure to "respond to any of the questions about methamphetamine" or conspiracy.  The State gave a race-neutral explanation for its strike of Attrell.

For Finch, the prosecutor said,

Mr. Finch, we were concerned with him for the same reasons that we were concerned with Attrell; he showed very little inclination or ability to answer the question about methamphetamine, about the conspiracy questions.  We were concerned about his educational level and his ability to understand the concepts.[4]

---

[3]Additionally, the State claimed it struck the African-American, thirty-five year-old because of his lack of ties to the community; however, the older African-American veniremember had been at his current job five years, in which he had lived in Dallas County.  Conversely, the white, younger veniremember had lived in the county only one and one-half months and had no job.  Further undermining the State's explanation, half the selected jurors were younger than thirty-five. *Chivers*, 796 S.W.2d at 543.

[4]Initially, regarding Finch, the prosecutor stated, "[Y]es, he is a black male but I would point out we left four black people on the jury.  We struck and [sic] equal number of men and women."  After consulting her notes, the prosecutor gave the above quoted explanation.  We offer no opinion as to whether this statement, that the State left other African-Americans on the jury, constitutes a race-neutral explanation, because without juror questionnaires or any other evidence in the record, it is impossible to know the make-up of the venire or final panel.

Education may be the basis of a racially neutral peremptory strike. *Rice v. State*, 746 S.W.2d 356, 357 (Tex. App.—Fort Worth 1988, pet. ref'd) (veniremember misspelled several words on information card); *see also Hastings v. State*, 755 S.W.2d 183, 186 (Tex. App.—San Antonio 1988, pet. ref'd) (veniremember misspelled word and wrote date of birth in wrong space on information card). The State gave a race-neutral reason for its strike of Finch.

The burden shifted to Burris to rebut the State's race-neutral explanation on both Attrell and Finch. Burris' attorney said to the trial court,

> I was looking at the jurors. I certainly didn't see any problems with Mr. Attrell or Mr. Finch and their ability to understand the questions. In fact, they were engaged in answering questions and answered the questions that were put to them. . . . As far as Mr. Attrell and the question about, well, because of his age -- age is also a cognizable group and is subject to a Batson challenge.

Burris did not cross-examine the prosecutor or offer any testimony or evidence to rebut the State's explanation of its strike of Attrell or Finch. *Cf. Satterwhite v. State*, 858 S.W.2d 412, 424 (Tex. Crim. App. 1993) (defendant failed to rebut State's reason where did not cross-examine prosecutor and offered no evidence to rebut State's race-neutral reasons for strike). As for Burris' claim that Attrell was "engaged in answering questions and answered the questions" put to him, our reading of voir dire reveals no instances where Attrell was directly questioned or made answers. The trial court was best positioned to evaluate the credibility of the prosecutor, as well as to observe any behaviors by Attrell and the rest of the venire. Burris did not rebut the State's explanation for its strike of Attrell.

On one occasion, Finch was directly questioned by Burris, who asked Finch why, in some circumstances, police may be required to record a suspect's statement. Finch answered,

6

"For evidence."[5]  It is true that the State did not question Finch or develop any record as to his education or intelligence level—and, again, the juror information cards are not part of the record, so we have no way of knowing if the cards gave indications of any of the veniremembers' education levels.  But the ultimate burden to rebut the State's race neutral reason and to prove to the trial court that the State's reason was a pretext to hide a racial motivation "rests with, and never shifts from, the opponent of the strike."  *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995); *Ford v. State*, 1 S.W.3d 691, 693 (Tex. Crim. App. 1999).

Burris argues the record shows the State's disparate treatment of Finch versus another veniremember.  After Finch said a statement might be recorded to be used as evidence, Burris asked another veniremember, identified as Zimmerman, why such a recording requirement might exist.  Dr. Zimmerman replied, "For accuracy."  Burris argues that, because Zimmeran made it to the jury, but Finch was struck, despite their giving similar answers to the question about recording statements, this reveals a pretextual basis for the State's peremptory strike.  But part of the State's stated reason for striking Finch was concern "about his educational level and his ability to understand the concepts" at issue in the case.  Zimmerman said during voir dire that he specialized in pulmonary and critical care medicine, and he was addressed as doctor throughout the jury selection.  Burris did not rebut the State's reasons for striking Finch.

---

[5]We find only one other moment where Finch appears to have been addressed directly.  While the State's attorney was explaining the law of conspiracy, she asked the venire what kind of act – a legal or illegal action – she should be required to commit in order to be subject to prosecution and punishment.   The prosecutor then said, "You're making a face, Mr. Finch.   Are you kind of -- are you thinking about that?  Does something about that statement bother you?"  Mr. Finch answered, "No."

*Natasha Frieson*

Burris claims error where the State struck Natasha Frieson. The State answered Burris'

*Batson* challenge as follows:

> Mrs. Frieson appeared to be asleep during part of the questioning. She never made eye contact with either attorney[] and she appeared to be irritated at having to be in the room, by her facial expressions.

A veniremember falling asleep during voir dire is a race-neutral basis for exercising a

peremptory strike. *See Ivatury v. State*, 792 S.W.2d 845, 847–48 (Tex. App.—Dallas 1990, pet.

ref'd). The State also said Frieson appeared irritated at having to be in the courtroom. The

demeanor of a potential juror is a valid basis to exercise a peremptory strike. *Yarborough v.*

*State*, 947 S.W.2d 892, 896 (Tex. Crim. App. 1997); *see also Nieto v. State*, 365 S.W.3d 673,

680 (Tex. Crim. App. 2012) (State's description of veniremember's demeanor "considered

proved on the record" where defendant failed to rebut State's explanation). The State's

explanation for its strike of Frieson was race neutral.

Burris answered the State's race-neutral explanation in this way:

> As far as Mrs. Frieson being asleep, I saw Mrs. Frieson. At times she had her eyes closed but it was only for a couple of seconds at a time. She opened them and looked immediately back at the prosecution again while they were going through their spiel in voir dire. Mrs. Frieson was not asleep. She was being attentive.

Burris, though, did not offer any evidence to rebut the State's explanation. He did not cross-

examine the prosecutor or ask Frieson to offer testimony about whether she had been asleep

during voir dire. The State claimed that Frieson appeared to sleep through part of the voir dire.

Both the prosecutor and Burris attorney could have been correct. Burris also offered nothing to

contradict the State's observation that Frieson appeared "irritated at having to be in the room, by her facial expressions." The trial court was in a position to consider any demeanor or behavior of the venireperson as well as the credibility of the prosecutor and her explanation. Burris has provided nothing in the record to establish that the trial court's ruling on the *Batson* challenge to Frieson was clearly erroneous.

### *Emma Simmons*

The State struck Emma Simmons because "she didn't complete her questionnaire, which we felt indicated a resistance to following the law and the instructions." On its face, this is a racially neutral explanation. Failure to complete a juror information card may be a race-neutral reason to strike. *See Satterwhite*, 858 S.W.2d at 423; *Roy v. State*, 813 S.W.2d 532, 538 (Tex. App.—Dallas 1991, pet. ref'd). An inability to follow the law, even if only surmised by the prosecutor, would also be a race-neutral reason to strike a veniremember. *See Nieto*, 365 S.W.3d at 679 (State may strike based on hunch or past experience if racial discrimination is not motive).

Burris offered no rebuttal of the State's explanation regarding Simmons. In his appellate brief, Burris complains that the juror questionnaires are not part of the record. Burris' failure to rebut the State's explanation amounts to a failure of his burden to show purposeful discrimination. As for the contents of the appellate record, it is the appellant's burden to present a record to the appellate court supporting his or her points of error. *See* TEX. R. APP. P. 34.5; *Ortiz v. State*, 144 S.W.3d 225, 230 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd).

Having reviewed the record, we cannot say that Burris demonstrated that the State's explanations for its strikes were pretexts for racial discrimination. We give great deference to

9

the trial court's *Batson* rulings, as such determinations often turn on the credibility of the prosecutor and the veniremembers. *See Yarborough*, 947 S.W.2d at 896. Because the record does not establish that any of the trial court's rulings were clearly erroneous, we will not disturb those rulings. *See Watkins*, 245 S.W.3d at 448.

Burris also raises a point of error complaining of the State's choice not to exercise a peremptory strike on veniremember Michael Hayes. Burris complains that, when asked why the State did not exercise a peremptory strike against Hayes, the prosecutor told the trial court the State had the right not to exercise all its strikes and pointed out that other African-Americans had been seated on the jury. We agree with Burris that even a single strike based on race offends the United States Constitution. *See Turner v. State*, 827 S.W.2d 333, 334 (Tex. Crim. App. 1992). That said, Burris offers no authority or clear argument for his proposition that the State had to offer a racially neutral explanation for *not* striking Hayes.[6] We cannot see how not exercising a peremptory strike falls within the realm of *Batson*. We overrule this point of error.

*(2)     Admitting the Report of Burris' Pseudoephedrine Purchases Was Proper*

Burris also complains of the trial court's admission of records documenting Burris' multiple purchases of pseudoephedrine. The State filed the records along with a business records affidavit in the trial court about six months before trial. *See* TEX. R. EVID. 803(6), 910(10). Burris claims that, because the requisites of Rule 803(6) were not satisfied, the records were

---

[6]Burris' only argument is that, "Having made an explanation for excluding Mr. Hayes [i.e., the prosecutor's statement that she had a right not to exercise all her strikes, and pointing out that four members of the jury were black], it has to be a race neutral reason."

10

inadmissible hearsay. Burris argues, alternatively, that the records were police reports and therefore inadmissible.

> One exception to the rule against hearsay is for records or reports
>
> made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . .

TEX. R. EVID. 803(6). Such evidence may also be admitted if the above requisites are satisfied by an appropriate affidavit. Records "shall be admissible in evidence in any court in this state on the affidavit of the person who would otherwise provide the prerequisites of Rule 803(6) or (7)." TEX. R. EVID. 902(10)(a).

We review for an abuse of discretion a trial court's decision to admit or exclude evidence. *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002). A trial court does not abuse its discretion if the decision to admit evidence is within the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). We may not substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). If the trial court's decision on the admission of evidence is supported by the record, there is no abuse of discretion, and the trial court will not be reversed. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002); *Montgomery*, 810 S.W.2d at 379. We will also sustain the trial court's ruling if it is correct under any theory of law applicable to the case. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000).

11

Some eight months before trial, the State filed its records of Burris' purchases of pseudoephedrine. The records were accompanied by an affidavit executed by James Acquisto, who swore to be the custodian of the records for a company called Appriss, Inc.; Acquisto's affidavit was in the necessary format. *See* TEX. R. EVID. 902(10). The affidavit stated that the attached records were kept in the regular course of business by Appriss by an employee or representative of Appriss who had knowledge of the acts, events, conditions, opinions, diagnostics, or results in said records and that the records were made at or near the time of the occurrence of the events described in the records.

Burris first complains that there was no evidence the business records were made in the course of a regularly organized business activity. This overlooks the affidavit that accompanied the records: the affidavit and records were filed in the trial court more than fourteen days before trial and were all admitted into evidence. The affidavit recited that the affiant was the custodian of the attached records, that the records were kept by the company Appriss in the regular course of business, and that the regular course of that business included an employee or representative of the company making such records. The affidavit also said that such employee or representative had knowledge of the events, acts, conditions, or results depicted in the records and that the events chronicled in the records occurred at or near the time the records were made. The affidavit is sufficient. *See* TEX. R. EVID. 803(6); *see also* TEX. R. EVID. 902(10). The affidavit was evidence of matters contained in the records. *See Barnes v. LPP Mortg., Ltd.*, 358 S.W.3d 301, 308 (Tex. App.—Dallas 2011, pet. denied) (affidavit accompanying business

12

records sufficient to establish amount due on note). The trial court did not abuse its discretion in admitting the records.[7]

Burris also complains that, even if the records were admissible under the business records exception, the records were effectively police records and thus not admissible under the business records exception. *See Davenport v. State*, 856 S.W.2d 578, 579 (Tex. App.—Houston [1st Dist.] 1993, no pet.). The investigating officer, Anson Amis of the Lamar County Sheriff's Department, testified that the records compiled by Appriss were available only to law enforcement. Amis said the company compiled records of purchases of pseudoephedrine, and these records were monitored by law enforcement. Amis also said he was able to get email notifications when specific persons bought pseudoephedrine advising him of the locations of those sales. We disagree with Burris' argument that this makes the records effectively law enforcement reports. He cites *Davenport* and *Berman*. *Berman v. State*, 798 S.W.2d 8 (Tex. App.—Houston [1st Dist.] 1990), *pet. dism'd, improvidently granted*, 817 S.W.2d 86 (Tex. Crim. App. 1991). *Davenport* involved testimony by a crime laboratory chemist, who testified that resin found on a pipe contained cocaine, but whose report was excluded. *Davenport*, 856 S.W.2d at 579. *Berman* involved documents generated at the jail from which the defendant was

---

[7]Burris cites *West v. State*, 124 S.W.3d 732 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). *West* involved a testifying witness, not an affidavit, and the witness failed to state that the records were kept as part of the regular business activity of the bank supplying the records—she just said the records were kept. This was held insufficient to meet Rule 803(6)'s requirements. *Id.* at 736–37. Here, the affidavit stated the records were kept in the regular course of business.

accused of escaping. These cases involved documents or records generated by law enforcement or at the behest of law enforcement in the course of an investigation.[8]

In *Cole*, the Texas Court of Criminal Appeals held that a chemist's report from the Department of Public Safety (DPS) crime laboratory was not admissible under Rules 803(6) or 803(8). *Cole v. State*, 839 S.W.2d 798, 812–13 (Tex. Crim. App. 1992) (op. on reh'g). "A DPS laboratory is a uniquely litigious and prosecution-oriented environment." *Id.* at 809–10. The court noted that the DPS laboratory reports bore insignia of the State of Texas and law enforcement, suggesting the proffered records were generated in an adversarial context. In contrast, the court cited *United States v. Orozco*, 590 F.2d 789, 793–94 (9th Cir. Cal. 1979), where records compiled of license plate numbers on vehicles passing through a border station were deemed not to have been collected in an adversarial setting, and nothing about the collection procedure was seen as indicating a lack of trustworthiness. In the situation here, there is no indication that the company that collected records of persons buying pseudoephedrine was associated with law enforcement or that the records were gathered as part of any adversarial process. The company collected records of sales and made the records available to law enforcement. That is not the same as saying the records were those of a law enforcement agency. We reject Burris' claim that the records were essentially police reports. This point of error is overruled.

---

[8]The arrest blotter records were "statements made in an adversarial setting" and were "not merely made as a result of ministerial objective observations." *Berman*, 798 S.W.2d at 12.

*(3)      Sufficient Evidence Established the Quantity of Methamphetamine to be Manufactured*

Next Burris complains that the evidence was insufficient to prove how much methamphetamine could be manufactured from the pseudoephedrine possessed by Burris and his two associates. The State presented testimony from Tommy Moore, a detective with the Paris Police Department who had significant experience in narcotics investigations. Moore testified that the 7.2 grams of pseudoephedrine bought by Burris and the two other individuals would yield about 3.5 grams of methamphetamine. The evidence was sufficient.

Detective Moore testified that, through a company that collects information on the purchase of pseudoephedrine, Moore became aware that Burris and co-defendants Karen and Brandy Goodwin were making repeated purchases of pseudoephedrine. Moore had spent about thirteen of his eighteen years on the police force working on narcotics cases and had been trained in the procedures for making methamphetamine at the Drug Enforcement Agency's (DEA) training program. Suspecting that the three individuals planned to manufacture methamphetamine, Moore began an investigation. The three suspects were found with several boxes of pseudoephedrine, which they had purchased at various pharmacies in Paris. Moore also found receipts documenting the purchase of drain cleaner and an instant cold compress. Moore explained that these items, along with pseudoephedrine, were used in the manufacture of methamphetamine.

Among them, the three alleged conspirators had 7.2 grams of pseudoephedrine. Moore testified that he had spoken to chemists and "actual meth cooks" and that these parties had told him that pseudoephedrine would yield about half its weight in methamphetamine.

15

I've talked to chemists who've told me what they see and I've talked to actual meth cooks -- I've interviewed numerous meth cooks and they -- almost all of them will tell you about the same -- what the yield is from a certain amount of ephedrine or pseudoephedrine, what you get on your finished product . . . [is] [a]bout half. If you have 4 grams of ephedrine, then you're probably going to get two grams of meth.

Moore said this was a "conservative estimate." On November 9, 2011, Burris and the two women with him each bought 2.4 grams of pseudoephedrine. These 7.2 grams of pseudoephedrine would yield approximately 3.5 grams of methamphetamine.[9] Moore made this calculation based on his experience making methamphetamine at the DEA training program and his other training and experience in his narcotics investigations over the course of his career.

Moore's testimony is sufficient evidence[10] that Burris and his co-conspirators conspired to make one or more but less than four grams of methamphetamine.[11]

*(4)      Burris' Complaint about Being Committed to SAFP Was Not Preserved*

Burris also argues that the trial court erred in ordering him to attend and complete a Substance Abuse Felony Punishment (SAFP)[12] program incident to his community supervision.

---

[9]In asking for his estimate, the prosecutor asked Moore to "please err on the low side."

[10]In evaluating legal sufficiency, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found beyond a reasonable doubt the essential elements of conspiracy to manufacture one or more but less than four grams of methamphetamine. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

[11]The State points out that Burris objected only that Moore was not listed as an expert witness. But as this is a challenge to the sufficiency of the evidence, the lack of such listing is irrelevant to our review.

[12]*See* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 14 (West Supp. 2013).

16

The jury assessed a sentence of five years and recommended that the sentence be suspended. As conditions of community supervision, the trial court required Burris to spend 180 days in the county jail and be confined in and complete a SAFP program. Because Burris made no objection to this term of supervision, he preserved nothing for this Court to review.

A trial court may make participation in SAFP a term and condition of community supervision if the trial court affirmatively finds that (1) drug or alcohol abuse significantly contributed to the commission of the crime for which the defendant was convicted; and (2) the defendant is a suitable candidate for treatment, as determined by the suitability criteria established by the Texas Board of Criminal Justice. TEX. CODE CRIM. PROC. ANN. art. 42.12, § 14(a), (b). Burris complains that the trial court ordered him to a SAFP facility without first ordering a substance abuse evaluation prescribed by law. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 9(h) (West Supp. 2013). Burris did not object to the trial court's imposition of the SAFP conditions at sentencing. Just as a presentence investigation may be waived,[13] we find Burris waived this complaint. *See Caster v. State*, 87 S.W.3d 751, 752 (Tex. App.—Texarkana 2002, no pet.). Further, Burris' brief presents no argument on this point. *See* TEX. R. APP. P. 38.1(i).

Burris also presents a related no-evidence point, arguing that there was no evidence that he had a drug or alcohol problem or that drugs or alcohol significantly contributed to the commission of the crime for which he was convicted. Thus, reasons Burris, a SAFP program was not appropriate. While it is true the trial court made no explicit findings on the record to

---

[13]*Eddie v. State*, 100 S.W.3d 437, 445 (Tex. App.—Texarkana 2003, pet. ref'd).

support his findings that "drug abuse did significantly contribute to the commission of the [instant] crime" and that Burris was "a suitable candidate for treatment as determined by the Texas Board of Criminal Justice in accordance with Section 493.009 B [sic], Texas Government Code," we presume the trial court made the necessary findings to support his ruling. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Ice v. State*, 914 S.W.2d 694, 695–96 (Tex. App.—Fort Worth 1996, no pet.).

There was evidence Burris and his two co-defendants conspired to make methamphetamine. The arresting officer said that, when asked about the amount of pseudoephedrine the parties had been purchasing, Burris initially said he had allergy problems, but soon thereafter said it was going to be used to make methamphetamine. At the time of their arrest, one of the co-defendants had a pipe associated with smoking drugs and a small amount of methamphetamine. These facts are consistent with drug abuse and support the trial court's finding that drug abuse significantly contributed to the commission of the offense for which Burris was convicted. We overrule Burris' points of error related to the SAFP program.

We affirm the judgment of the trial court.


Josh R. Morriss, III
Chief Justice


Date Submitted:     November 4, 2013
Date Decided:       February 12, 2014

Do Not Publish

18