

# Fourth Court of Appeals

## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-15-00558-CR

Jose **GONZALEZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 144th Judicial District Court, Bexar County, Texas
Trial Court No. 2014CR8928
Honorable Lorina I. Rummel, Judge Presiding

Opinion by:    Rebeca C. Martinez, Justice

Sitting:    Karen Angelini, Justice
            Rebeca C. Martinez, Justice
            Patricia O. Alvarez, Justice

Delivered and Filed:  July 20, 2016

AFFIRMED

A jury found appellant, Jose Gonzalez, guilty of the murder of Ahn Cisneros and assessed punishment at thirty years' confinement.  In several issues on appeal, Gonzalez asserts the trial court erred by admitting prior extrinsic "bad act" evidence, trial counsel rendered ineffective assistance of counsel, and the evidence was insufficient to support the jury's verdict and to support the jury's implicit rejection of his claim of self-defense.  We affirm the judgment of the trial court.

# BACKGROUND

In 2014, Rachel Gonzalez and Ahn Cisneros were in a relationship and living together, along with Rachel's children. Rachel admitted she and Ahn had an "on-and-off relationship" because of Ahn's relationships with other women.

In May 2014, Gonzalez asked Rachel, his cousin, for a place to live. Ahn offered his house to Gonzalez because Ahn spent most of his time at Rachel's house. Soon thereafter, Gonzalez and his girlfriend Trudy Ramos moved into Ahn's house. In June 2014, Rachel and Ahn argued, and Ahn moved back to his own house. Shortly thereafter, Gonzalez and Trudy left Ahn's house and moved in with Rachel.

Soon after this move, Ahn called Trudy and accused her of taking some of his household items. Trudy, who denied the accusation, told Rachel that Ahn was "disrespecting" her. Rachel said Ahn and Gonzalez never had any verbal confrontation; there was "just tension" and "it was uncomfortable." Rachel testified that, although she and Ahn were apart, they still talked. However, she felt the need to act as a buffer between Ahn on the one side and Gonzalez and Trudy on the other side because of the tension between the three.

Rachel denied ever telling Gonzalez she felt threatened by Ahn or needed Gonzalez's protection, or that her children were in danger and needed protection from Ahn. However, Rachel admitted Ahn had once kicked her on her shin during an argument. She also admitted she had complained to Gonzalez about Ahn and his flirtatious nature and his viewing of pornography, and that she felt Ahn was not respectful towards her.

Rachel and Ahn spent the weekend of June 28 and 29, 2014 together, although Ahn was still living at his own house. On the morning of June 30, 2014, Ahn went to Rachel's house to see her before she left for work. When Rachel left for work, Ahn also left because Rachel "was afraid [Gonzalez] would get upset or something because [she did not] think [Gonzalez] wanted" her and

Ahn to be together. Rachel explained that Gonzalez told her that if she intended to be with Ahn, then she needed to put Ahn on "probation" because of Ahn's history of occasionally seeing other women. When Rachel and Ahn left the house, Gonzalez, Trudy, and Rachel's children were all still asleep in the house.

At some point later that day, Rachel's daughter called her to say that Ahn had returned to the house and Trudy was upset. Shortly after 5:00 p.m., as Rachel was driving home from work, she spoke on her cell phone to Ahn, who was in Rachel's bedroom. Rachel said Ahn locked her bedroom door as they spoke. According to Rachel, she told Ahn she was not comfortable with him being at her house without her because of the tension, and Ahn said he would apologize to Gonzalez. Rachel stated that while she was on the phone with Ahn, she did not hear any argument or confrontation. However, as they spoke, Rachel heard Ahn make a "weird noise" and yell, and then she heard gunshots. Rachel said she heard nothing more from Ahn, but she heard her son yelling "why did you do that?" She also heard Gonzalez calling for Trudy.

About one block from her house, Rachel stopped when she saw a police car, and she told the police officer that he needed to go to her house because Ahn was not responding to her and she thought something "really bad just happened." She told the officer she thought Gonzalez had shot Ahn.

While Rachel was still holding her telephone, she heard her son say "here it is" and then the phone disconnected. Before Rachel reached her house, she received a text message from Trudy telling her not to come home. Gonzalez also called Rachel but would not tell her what happened, and instead, asked her if she was alone and told her to call Trudy. Gonzalez also said "Damn, Rachel, damn." By the time Rachel arrived home, police officers were waiting outside her house. When she unlocked the backdoor, the smell of bleach was apparent and there was blood on the washer and dryer. Rachel said Trudy was standing in the laundry room crying.

Ida Samudio, a neighbor who lived across the street from Rachel, said another neighbor called her to say she thought she heard four gunshots. When Samudio looked out her window towards Rachel's house, she saw Gonzalez and Trudy carry a body outside and put the body into the trunk of Ahn's car, a gray Dodge Dart. She thought the body was moving and the person might still be alive, but she also admitted the movement may have resulted from Gonzalez and Trudy having trouble getting the body into the trunk. She told her boyfriend to call 911.

Trudy testified that, sometime in 2014, she purchased the gun used to shoot Ahn. She said she later "lost track" of the gun after an argument with Gonzalez, whom she was dating at the time. Trudy said the gun had been in Gonzalez's truck and he had access to the gun. Trudy testified Rachel told her she did not want Ahn to be at her house when Rachel was not also there. On the day of the shooting, Trudy and Gonzalez went to visit Gonzalez's brother. According to Trudy, his brother wanted her and Gonzalez to move in with him and his family. She said she and Gonzalez planned to "just pack up [their] stuff and leave" Rachel's house because she and Gonzalez did not "want any involvement with Rachel and Ahn's relationship." She denied complaining to Gonzalez about how Ahn treated her, Rachel, or Rachel's children.

While at Gonzalez's brother's house, Trudy had to return to Rachel's house on an errand. She said Gonzalez, whom she described as "somewhat" controlling, was angry because she intended to leave without him. When Trudy arrived at Rachel's house at about 4:00 or 4:30 p.m., Ahn was inside the house in the living room with Rachel's two children. Trudy texted Gonzalez to tell him that Ahn and Rachel's children were at the house, but she said she did not tell Gonzalez there were any problems or need for him to come to the house. Nevertheless, Gonzalez responded that he was on his way to Rachel's house so that they could pack their belongings and leave.

Trudy said that when Gonzalez arrived at Rachel's house, she was sitting outside on the front porch with Rachel's daughter, while Ahn was inside the house with Rachel's son. She said

Gonzalez did not say anything to her, but instead, walked directly into Rachel's house through the back entrance. After Gonzalez entered the house, Trudy heard no arguments or indication of a fight. Instead, she heard four gunshots. After hearing the shots, Trudy went into the house, saw blood on the floor and Gonzalez coming out of the laundry room looking panicked, scared, and angry. She said Gonzalez scared her because he "was just talking really aggressive towards" her and telling her to help him move Ahn's body and clean up the blood. She said Gonzalez handed her the gun and told her to "get rid of it." She hid the gun under the mattress in the bedroom she and Gonzalez shared. She said she helped Gonzalez because she was afraid of him. Trudy later testified that Gonzalez assaulted her, "busted [her] head open" and choked her the night he stole the gun from her. However, she admitted she stayed in the relationship with Gonzalez after this alleged assault.

Rachel's son, Ruben, testified that a few days before the shooting,

[Gonzalez] said, Do you care if anything happened to Ahn? And I said, I don't know, why? And he said because he [Gonzalez] — he's going to kill [Ahn], that he was going to put a bullet in his head, like one right here (indicating). And he said he's gonna — he's gonna cut the mattress open and use that as a body bag and he's going to take it to his brother's and he's going to chop him up and send — like take him far away. . . . [H]e was just gonna make it seem [like] Ahn went missing.

Ruben said he asked Gonzalez, on the day before the shooting, whether he was still "going to do it," and Gonzalez said "no." According to Ruben, Gonzalez wanted to kill Ahn because Gonzalez did not like the way Ahn treated Rachel.

Ruben testified that, on the afternoon of the shooting, Gonzalez entered through the back of the house with a gun in his hand. Ruben said he stood up and said to Gonzalez, "what are you doing? Stop." Gonzalez ignored Ruben and walked past him to try to open the door to Rachel's bedroom. When Gonzalez could not open the door, he kicked it open, told Ahn to "Get the F out," and then shot Ahn twice. Ruben described Gonzalez as "mad." After hearing two shots, Ruben

heard Ahn reply "Okay, okay," but it sounded like Ahn had blood in his mouth. At this point, Ruben ran to the front of the house, and told his sister and Trudy that Gonzalez shot Ahn. By the time Ruben went back into the house, he heard two more shots. As Ruben entered the living room, he saw Ahn on the floor in the laundry room.

Rachel's daughter, Cassandra, also testified. She said that when Gonzalez arrived at their house the afternoon of the shooting, she thought he was mad because he drove into the driveway "fast." She did not see him enter the house through the back door, but she heard gunshots and Ahn yell. When she walked into the house, she saw blood on the floor of the living room and kitchen. She then saw Gonzalez hand the gun to Trudy. She said Gonzalez did not like the way Ahn treated her mother. Cassandra stated that, on the night before the shooting, while Ahn and Rachel were at the movies, Gonzalez told her that he "just didn't want to live under the same roof as" Ahn and that Gonzalez "wanted to get rid of him."

When the police arrived at Rachel's house, Ahn's car was not there, although the police found blood on Rachel's driveway. The police were also unable to locate Gonzalez. The officers handcuffed Trudy and placed her in a patrol car. Meanwhile, Rachel's children "came out crying that [Gonzalez] had shot Ahn."

San Antonio Police Detective John Hilliard testified he was sitting in his patrol car when Rachel approached him on foot. He said that as she was expressing her concern that something had happened at her house, a dispatch call came through his vehicle's computer about a disturbance at an address that turned out to be Rachel's house. Detective Hilliard said one of Rachel's neighbors had called the police to report a disturbance. En route to Rachel's house, additional information appeared from dispatch that the neighbor believed a body had been placed into a vehicle that then drove away from Rachel's house.

Once at Rachel's house, Detective Hilliard approached the house, and as he did so, Trudy stepped outside. When the detective called her name, Trudy went back inside the house. Detective Hilliard knocked on the door and received no answer. Once Rachel arrived, she gave her house key to the detective and he unlocked the door. Inside the house, Detective Hilliard smelled bleach and noticed that Trudy had changed clothes. He said she looked as if she had been cleaning. He also saw bloodstains on the laundry room floor, on the washer and dryer, and on a towel that Trudy was holding. But, he said there was no body at the scene.

San Antonio Police Detective Ben Flores testified that on the night of the incident he received a dispatch call to be on the lookout for a gray Dodge Dart and he was told the owner of the car might be deceased and inside the trunk. Detective Flores was told to look for the car on Fernview, the street on which Gonzalez's brother lived. When Detective Flores saw the car parked about two streets away from Fernview, he called other detectives and waited for their arrival. When Homicide Detectives Duke and Ramirez arrived, one of them opened the car's trunk to discover Ahn "faced down, shirtless, almost in a fetal position."

San Antonio Homicide Detective Mark Duke testified that, during his examination of the inside of Rachel's house, he saw multiple shell casings and bullet holes throughout the house and he believed the shooting occurred in multiple rooms. He stated Ahn's watch, which appeared to have come off his wrist in a bedroom, was found in another room of the house. Detective Duke said Gonzalez was apprehended in Houston, Texas about one month after the shooting and extradited back to San Antonio, at which time Duke interviewed him. During the interview, Gonzalez did not deny shooting Ahn, he did not deny putting Ahn's body into the trunk of a car, and he did not deny abandoning the car. However, Detective Duke admitted "[t]here were times when [Gonzalez] said he didn't want to talk about what Ahn did that made [Gonzalez] feel like he was threatened."

One of the crime scene detectives stated the evidence indicated Ahn was first shot in a bedroom and then shot repeatedly as he moved from the bedroom, through the living room and kitchen, and into the laundry room. Dr. Kimberly Molina, the medical examiner who testified about Ahn's autopsy, stated Ahn sustained eight gunshot wounds to his body—(1) to his right upper arm; (2) to his right lower chest; (3) to his right upper abdomen; (4) to the front of his left wrist; (5) to the side of his left elbow closest to his body; (6) to the right side of his back around his shoulder blade; (7) to his left upper back around his shoulder blade; and (8) to the left side of his back near his waistline. All gunshots exited Ahn's body, leaving no bullet inside his body. No alcohol, cocaine, or opiates were detected in Ahn's system. Ahn also had abrasions on the bridge of his nose, upper lip, right forearm, the back of his left wrist, the right side of his abdomen, and the right side of his back. Dr. Molina had no opinion on how Ahn sustained the abrasions, but she agreed he may have sustained them by taking either aggressive or defensive action. However, based on the location of the abrasions, she not believe any were consistent with Ahn being the aggressor.

Dr. Molina said the first and second wounds were consistent with shots being fired from the same direction and the second wound would not have prevented Ahn from moving. She stated the grouping of the first, second, and third wounds indicated the shots all occurred at the same time. Dr. Molina stated the gunshot stippling, found only on the first wound, indicated the end of the gun's barrel was two to three feet away from Ahn when the gun was fired. Dr. Molina did not know the position of Ahn's body at the time of each gunshot. Although she could not say what Ahn was doing as he sustained each shot, she said the autopsy revealed entrance wounds to both the front part and the back part of his body.

Gonzalez took the stand in his own defense, and testified that he has been incarcerated several times, once for attempted murder. He said he met Trudy in 2011 and had an on-and-off-

again relationship with her until June of 2014. He admitted that during this time, he and Trudy had "three major fights," two of which were physical, and one of the physical assaults resulted in criminal charges.

Gonzalez testified that on the morning of the shooting, he went to his brother's house to help his brother who had just been released from the hospital. At some point during the day, Trudy called him to say Ahn was at Rachel's house. He was annoyed with Trudy for calling while he was busy, and frustrated with Ahn because "he showed up at [Rachel's] house and he was giving me — he was giving — to me, I felt he was giving me a hard time because I had to do so many things that day and I just — I told [Trudy] just hold on, I'd be over there in a little while." Gonzalez said that when he asked his brother if he could borrow his car, he did not tell his brother where he was going because his brother was sick and he did not want to worry him.

Gonzalez denied driving fast when he arrived at Rachel's house and he said he had nothing in his hand when he exited the car. He said when he entered the house he went to the room he shared with Trudy to get the gun out of a lock-box. He retrieved the gun, inserted the clip, and chambered a round. Gonzalez said he took the weapon with him to Rachel's room because he was afraid of Ahn. By way of explanation, Gonzalez said that about two weeks before the shooting, Ahn told him that he had gone to jail for unlawfully carrying a weapon, that he had been in the military, and that he knew mixed martial arts. Gonzalez said he also knew about an incident when Ahn tried to force himself into Rachel's house and Rachel called the police.

Gonzalez said he then walked to Rachel's room, but he denied coming into contact with Ruben. He said he heard arguing from Rachel's room and he heard Ahn yelling at somebody. According to Gonzalez, Cassandra and Ruben were in Cassandra's room, he went to their room and closed the door, then went to Rachel's door and pressed his ear to the door trying to listen to

Ahn. Gonzalez said he intended to tell Ahn to leave. He denied kicking in Rachel's door, but he explained

> [I] grabbed the — the doorknob and I wanted to startle [Ahn]. I wanted to have the upper hand on him to, you know, scare him the way — you know, the way I'm thinking is that he's going to be startled, he's going to be scared and, you know, I'll — I'll work with that. . . . So, I turned the doorknob slowly so that he wouldn't hear the doorknob and I slowly opened it and then I — right when I was opening it, I hit the door with my elbow real hard. I — I mean, I kind of like punched it with my elbow. I went like that, boom (indicating). And then the door — then the door swung open.

Gonzalez said he saw Ahn sitting on the bed with his back to him. He said he told Ahn "to get the f**k out of the house" and he "made the best mean face [or game face] [he] could come up with." He stated Ahn startled him by putting his leg on top of the bed and lunging at Gonzalez, which is when Gonzalez shot Ahn. Gonzalez said he aimed at Ahn's arm because he did not want to kill him. Gonzalez said Ahn fell off the bed and against the wall, and started "cussing." Gonzalez again told Ahn to "get the f**k out." He said Ahn lunged at him and put his hands on Gonzalez, and he shot at Ahn. Gonzalez testified he grabbed Ahn and pushed him out of the bedroom. As Ahn moved into the kitchen, Gonzalez shot in Ahn's direction. When he saw that Ahn had grabbed something, he fired again at Ahn's shoulder. When Ahn finally went down in the laundry room, Gonzalez thought he was dead.

Gonzalez denied telling Trudy to do anything with the gun. Because he did not want Rachel to see Ahn and because he knew he would be arrested for Ahn's murder, Gonzalez decided to move Ahn's body. Gonzalez left the car, with Ahn's body in the trunk, about two blocks from his brother's house. He then went to his brother's house and told everyone to leave because he knew the police would soon be looking for him. He stayed in San Antonio for about one week and then left for Houston.

Gonzalez admitted he told Ruben he wanted to kill Ahn, but he said he did not mean what he said and he only meant to convey to Ruben that he would protect Ruben. He agreed that he told Ruben he could do things to Ahn because he (Gonzalez) had once slit another man's throat. Gonzalez said he told Ruben these things because Ruben had told him something that concerned Gonzalez about Rachel needing to protect herself from Ahn. Gonzalez said Rachel often complained to him about Ahn, and he did not know Rachel and Ahn had reconciled.

On cross-examination, the State confronted Gonzalez with the medical examiner's evidence that three of the bullets entered the side of Ahn's body, and the first shot went down through Ahn's arm. Gonzalez denied this position of the wound meant that Ahn was below him when Ahn was shot and not above Gonzalez lunging from the bed. Gonzalez admitted he opened the door to Rachel's room, Ahn's back was to him, the gun was loaded, a bullet was chambered, the safety was off, and he was ready to shoot. He also agreed that Ahn may have sustained the facial abrasions when he was placed in the car's trunk. He said Trudy had every reason to be afraid of him the day of the shooting. Although he denied threatening Trudy, he admitted he told Trudy, during a jailhouse telephone call, "You better be scared of me because if you leave me, I'll f**k you up." He explained he "was just playing around" and he "always said [he] was going to kill her, too."

A jury found Gonzalez guilty of murder and the trial court signed a judgment that included a plea of true to two enhancements for habitual offender.

## SUFFICIENCY OF THE EVIDENCE

Gonzalez asserts the evidence is legally insufficient to support the jury's verdict on murder and the jury's implicit rejection of his self-defense issue.

**A. Standard of Review and Applicable Law**

Due process requires the State to prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *see also Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (determining *Jackson* standard "is the only standard that a reviewing court should apply" when examining sufficiency of evidence). When considering the sufficiency of the evidence, we consider all the evidence, both direct and circumstantial, in the light most favorable to the verdict to determine whether any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899. We must resolve any inconsistencies in the evidence in favor of the jury's verdict, deferring to its assessment of the credibility and weight of the evidence. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). A jury is entitled to resolve any inconsistencies in the evidence, and is free to accept or reject all, some, or none of any witness testimony. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *Zuniga v. State*, 393 S.W.3d 404, 413 n.2 (Tex. App.—San Antonio 2012, pet. ref'd).

The essential elements of the crime are the elements of the offense as defined by the hypothetically correct jury charge for the case, which is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Johnson v. State*, 364 S.W.3d 292, 294 (Tex. Crim. App. 2012) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). The law as "authorized by the indictment" consists of the statutory elements of the offense as modified by the charging instrument. *Johnson*, 364 S.W.3d at 294; *Curry*, 30 S.W.3d at 404.

The offense of murder is committed when a person intentionally or knowingly causes the death of an individual, or when he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (West 2011); *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) (murder is a result-of-conduct offense that requires the culpable mental state relate to the result of the conduct, *i.e.*, causing the death). The jury was instructed that it could convict Gonzalez of murder if it found beyond a reasonable doubt that he intentionally or knowingly caused the death of Ahn Cisneros by shooting him with a deadly weapon, a firearm.

The jury also was instructed that if it instead found Gonzalez, with intent to cause serious bodily injury to Ahn, committed an act clearly dangerous to human life that caused Ahn's death by shooting him with a deadly weapon (a firearm), then the jury should next consider whether Gonzalez did so in self-defense.

A jury verdict of guilty is an implicit finding rejecting a defendant's self-defense theory. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). When a defendant challenges the legal sufficiency of the evidence to support the jury's implicit rejection of a self-defense claim, "we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Id.* Defensive evidence that is merely consistent with the physical evidence at the scene of the alleged offense does not render the State's evidence insufficient because the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence. *Saxon*, 804 S.W.2d at 914.

- 13 -

**B. Analysis**

In this case, the jury was free to reject some or all of Gonzalez's version of the events leading to the fatal shooting. Even if the jury did not believe Ruben's testimony that Gonzalez entered the house holding a gun, Gonzalez himself admitted he retrieved the gun from his room, loaded a clip, chambered a round, and did not engage the safety—all before making any contact with Ahn who was inside Rachel's room with the door closed. Although Gonzalez testified he first shot Ahn because Ahn lunged at him from the bed, the jury heard the medical examiner's testimony that the trajectory of the first bullet was downward. The jury also heard testimony that Gonzalez continued to shoot Ahn after Ahn left the bedroom, including shooting him in the back at least three times.

The only evidence offered to raise the issue of self-defense was Gonzalez's own testimony that he shot Ahn because Ahn lunged at him in the bedroom and he thought Ahn grabbed something in the kitchen. In our review, we defer to the jury's assessment of the credibility of the witnesses, and the jury in this case could have disbelieved Gonzalez's testimony. Furthermore, the jury was entitled to consider Gonzalez's actions in placing Ahn's body into the trunk of a car, fleeing the scene after the shooting, telling his brother's family to leave their house because he knew the police would be looking for him, and his flight to Houston. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (stating "factfinder may draw an inference of guilt from the circumstance of flight"); *Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App.—Fort Worth 2014, pet. ref'd) (acknowledging flight from scene as evidence jury could consider in rejecting self-defense claim).

Having reviewed all of the evidence in the light most favorable to the prosecution, we conclude the jury rationally could have found each element of the charged offense was proven beyond a reasonable doubt, and also rationally could have rejected Gonzalez's self-defense claim.

# PRIOR BAD ACT

Gonzalez asserts the trial court erred by admitting Trudy's testimony—during the State's case-in-chief—that he had "busted her head open and choked" her. The State asserts Gonzalez waived his objection and we agree.

During a bench conference, the State said it intended to inquire into Trudy's state of mind and whether she had been afraid of Gonzalez before the day of the shooting because he had previously beaten her and stolen her gun. The State argued defense counsel had opened the door to the testimony by leaving a false impression with the jury that Trudy had no reason to fear Gonzalez. Defense counsel objected that he did not open the door because he had asked only about Trudy's fear on the day of the shooting. The trial court agreed the door had been opened and allowed Trudy to testify about the alleged assault, but did not allow the State to introduce into evidence any photographs taken of Trudy the night of the alleged assault.

The State then asked Trudy whether she had been afraid of Gonzalez a few months before the shooting. Trudy responded affirmatively, and said Gonzalez assaulted her and "busted" her "head open and choked" her. The State then moved on to other questions.

Prior to the defense beginning its case-in-chief, the trial court and attorneys discussed various items on the State's "Notice of Intent to Introduce Evidence of Extraneous Offenses," which listed eighteen offenses. Item 12 on the list was that Gonzalez committed the offense of "assault bodily injury – married/cohab" against Trudy on or about April 14, 2014 for which criminal charges were pending. Item 13 was that Gonzalez committed the offense of "assault-bodily injury" against Trudy on "June 12, 2012 and on numerous occasions." The trial court discussed defense counsel's objection to each of the eighteen listed offenses. As to Item 12, the April 14, 2014 assault, defense counsel objected that evidence of the assault would be "extremely prejudicial to the defendant if it were disclosed at this point during the trial." The court reminded

counsel that "a false impression has been left so some of that information's before the jury." The court then asked the State "notice has been given in regards to number 12 and you're just going to wait and see how the evidence plays out?" When the State responded, "Yes," the trial court asked defense counsel if he intended to request a motion in limine in regards to item 12, and counsel replied "Yes." The court then granted the motion in limine as to both items 12 and 13.

During the defense's case-in-chief on direct examination, defense counsel asked Gonzalez to define his relationship with Trudy, and Gonzalez responded that they had only three major fights, two of which were physical. Defense counsel asked if Gonzalez had been charged with assault against Trudy, and Gonzalez responded there was an assault charge.

During the State's cross-examination of Gonzalez, the prosecutor asked whether Gonzalez denied punching Trudy, giving her a black eye, choking her, hitting her with a board, and hitting her on the back of her head with the butt of the gun. Gonzalez denied hitting her with the butt of the gun, punching her in the eye, and choking her. At no time did defense counsel object to the question. The trial court then allowed the State to introduce ten photographs showing Trudy's injuries. Defense counsel affirmatively stated "no objection."

On appeal, Gonzalez asserts the trial court erred by allowing Trudy's testimony because the evidence violated Texas Rule of Evidence 404(b) and no Rule 403 balancing test was conducted. To preserve error in admitting evidence, a party must make a proper objection and get a ruling on that objection. *See* TEX. R. APP. P. 33.1(a). In addition, a party must object each time the inadmissible evidence is offered or obtain a running objection. *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003). An error in the admission of evidence is cured where the same evidence comes in elsewhere without objection. *Id.* Furthermore, when a defendant affirmatively asserts he has "no objection" to the admission of evidence, he waives his right to complain on appeal. *Estrada v. State*, 313 S.W.3d 274, 302 (Tex. Crim. App. 2010). Finally, a motion in limine

is a preliminary matter and normally preserves nothing for appellate review. *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008). Error is preserved with regard to the subject of a motion in limine only when an objection is made at the time the subject is raised during trial. *Id.*

In the present case, the only objection raised to Trudy's testimony during the State's case-in-chief was that defense counsel had not opened the door. Defense counsel raised no other specific objection. Prior to the defense's case-in-chief, the trial court granted defense counsel's motion in limine as to the two assaults listed on the State's "Notice of Intent to Introduce Evidence of Extraneous Offenses." Defense counsel raised the assault first during direct examination of Gonzalez, did not object during the State's cross-examination of Gonzalez, and affirmatively stated no objection to the photographs showing Trudy's injuries. On this record we conclude Gonzalez's complaint was not preserved for our review on appeal.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In his final issues on appeal, Gonzalez asserts he received ineffective assistance of counsel at trial because his attorney (1) did not object to Trudy's testimony about the alleged assault, (2) did not object to improper jury arguments, and (3) failed to introduce evidence of Ahn's violent character.

### A. Standard of Review

To prevail on a claim of ineffective assistance of counsel, the defendant must show: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show deficient performance, the defendant must prove by a preponderance of the evidence that his attorney's representation "fell below the standard of professional norms." *Garza v. State*, 213 S.W.3d 338, 347-48 (Tex. Crim. App. 2007). "To demonstrate prejudice, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Id.* at 348. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

We "indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance." *Id.* at 689. "To defeat the presumption of reasonable professional assistance, any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999) (internal citations omitted). In this case, Gonzalez did not file a motion for new trial nor was any hearing held at which a record on trial counsel's strategy could be developed. Therefore, we are faced with a silent record. "When the record is silent as to counsel's reasons for his conduct, finding counsel ineffective would call for speculation by the appellate court, [and] [a]n appellate court will not speculate about the reasons underlying defense counsel's decisions." *Stults v. State*, 23 S.W.3d 198, 208 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). "If the record is silent as to the reasoning behind counsel's actions, the presumption of effectiveness is sufficient to deny relief." *Ruiz v. State*, 293 S.W.3d 685, 691 (Tex. App.—San Antonio 2009, pet. ref'd). The presumption prevails because "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003). "Absent such an opportunity, an appellate court should not find deficient performance unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

## B. Trudy's Testimony

With respect to Trudy's testimony, Gonzalez does not assert counsel was ineffective for eliciting testimony about the alleged assault during his own testimony or for not objecting to the

State's questioning him on cross-examination. Gonzalez's complaint on appeal is directed only to counsel's failure to object to Trudy's testimony during the State's case-in-chief.

During its case-in-chief, the State argued defense counsel opened the door to Trudy's testimony. Defense counsel argued at length about why the door had not been opened; however, defense counsel raised no other specific objections to Trudy's testimony. Even if defense counsel's performance was deficient in this instance, we do not believe Gonzalez has established prejudice for several reasons. First, Gonzalez admitted shooting Ahn several times. Second, Trudy and both of Rachel's children—all of whom had a personal relationship with Gonzalez— testified about what happened in a manner consistent with what the investigating officers and medical examiner stated the physical evidence showed. Third, during closing arguments, the State argued Gonzalez did not care about the children or about Trudy when he left them behind at a bloody crime scene. The State did not point to the prior alleged assault against Trudy as evidence of Gonzalez's violent nature. Instead, the State argued Trudy helped Gonzalez because she was afraid of him because he beat her over the head with a gun, choked her, and gave her a black eye— everything Gonzalez himself was questioned about during his own testimony. Finally, the jury charge contained an instruction limiting the jury's consideration of prior misconduct or offenses solely to assessing Gonzalez's credibility as a witness in his own behalf and the weight given his testimony and to rebut a defensive theory. On this record, we do not believe Gonzalez has shown the outcome of the trial probably would have been different but for trial counsel's actions. Therefore, we conclude he did not demonstrate he received ineffective assistance of counsel under these circumstances.

## C. Closing Arguments

Gonzalez next complains trial counsel failed to object during the State's closing arguments when the prosecutor (1) offered unsworn testimony and injected her own personal opinion, (2)

made a statement that contradicted the court's charge and misstated the law, and (3) implied it was improper to consider Gonzalez's claim of self-defense.

Proper jury argument generally falls within four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, or (4) plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). Counsel is allowed wide latitude to draw inferences from the record, as long as the inferences are reasonable, fair, legitimate, and offered in good faith. *Shannon v. State*, 942 S.W.2d 591, 597 (Tex. Crim. App. 1996).

### 1. Personal opinion & unsworn testimony

Gonzalez first complains the prosecutor improperly offered her own unsworn testimony and personal opinion when she stated: "Folks, in my experience, strong cases are answered by desperate defenses and this is a desperate defense."

A prosecutor may argue personal opinions concerning issues in the case so long as the opinions are based on evidence in the record and do not constitute unsworn testimony. *Wolfe v. State*, 917 S.W.2d 270, 281 (Tex. Crim. App. 1996); *McKay v. State*, 707 S.W.2d 23, 37 (Tex. Crim. App. 1985). For example, in *Sikes v. State*, the prosecutor's statement, "I think old James Sikes is just as guilty as he can be," was not an improper injection of the prosecutor's personal opinion. 500 S.W.2d 650, 652 (Tex. Crim. App. 1973). In that case, the prosecutor made the statement following a summation of the evidence and continued with, "and I'll tell you why I think that. I think we have proved that to you beyond a reasonable doubt." *Id.* After the trial court overruled the objection to the statement, the prosecutor reiterated, "I think the evidence shows it, ladies and gentlemen." *Id.* The Court of Criminal Appeals evaluated the offending statement in the context in which it was made and determined it was merely a reasonable deduction from the prosecutor's analysis of the evidence. *Id.*

Here, the statement about which Gonzalez complains followed defense counsel's closing arguments. After making this statement, the prosecutor then stated, "I want you to look at the evidence as a whole, not just bits and pieces; okay?" The prosecutor then summarized the evidence. We conclude the prosecutor's remark was not an opinion about the testimony of any witness, including the veracity of Gonzalez's testimony. Nor was the prosecutor injecting unsworn testimony into her arguments. Instead, the prosecutor attempted to refute Gonzalez's self-defense claim by urging the jury to consider all the evidence.

## 2. Misstatement of the law

Gonzalez contends the following two statements contradicted the jury charge and misstated the law:

> He was a felon in possession of a weapon. You can't be engaged in criminal activity and be presumed reasonable.
> . . .
> The State's testimony, the State's evidence, was credible. The only evidence of self-defense or necessity came from him. And you can conclude that he was not telling you the truth.

Although it is not error for the State to quote or paraphrase the jury charge, jury argument that misstates the law or is contrary to the court's charge is improper. *Whiting v. State*, 797 S.W.2d 45, 48 (Tex. Crim. App. 1990). As to the statement that Gonzalez was "a felon in possession of a weapon [and you] can't be engaged in criminal activity and be presumed reasonable," the jury charge instructed the jury that a defendant's belief that deadly force was immediately necessary "is presumed to be reasonable if the defendant," among other things, "was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used." The complained-of statement was immediately preceded by the following argument:

> You have to ask yourself, did he reasonably, reasonably believe that deadly force was necessary to protect himself. And further along in the charge, the Court tells

- 21 -

you he's only presumed to be reasonable if he didn't provoke the situation. Obviously, he did. And if he wasn't otherwise making a crime, creating a crime. He was a felon in possession of a weapon. You can't be engaged in criminal activity and be presumed reasonable. So, that part of the charge is extremely important, because let's face it, this all comes down to what was going on in his mind. Right?

We conclude the prosecutor's statement that Gonzalez was a felon in possession of a weapon and that a defendant cannot be engaged in criminal activity and be presumed reasonable was consistent with the law and merely paraphrased the jury instruction.

Gonzalez also contends the statement that the jury could conclude he was not telling the truth because the State's testimony and evidence was credible, and the only evidence of self-defense or necessity came from Gonzalez was improper. A prosecutor may argue her opinions concerning issues in the case so long as the opinions are based on the evidence in the record and do not constitute unsworn testimony. *Wolfe*, 917 S.W.2d at 281; *McKay*, 707 S.W.2d at 37. Furthermore, a prosecutor may argue that defense witnesses are not worthy of belief. *Satterwhite v. State*, 858 S.W.2d 412, 425 (Tex. Crim. App. 1993). Arguing that a witness is lying constitutes an argument to the jury that the witness is not worthy of belief. *Gaffney v. State*, 937 S.W.2d 540, 543 (Tex. App.—Texarkana 1996, pet. ref'd). "Where the defendant takes the stand, his credibility is in question, and the prosecution has the right to attack his testimony in the same manner as any other witness, so long as the opinions of counsel are based upon the facts and inferences provided by the evidence." *Id.*

Here, the prosecutor's argument fell within the bounds of proper jury argument as a reasonable deduction from the evidence. Gonzalez testified in his own behalf, thereby placing his credibility at issue. After making the statement, the prosecutor summarized the evidence and explained why she believed Gonzalez was not credible. Thus, the prosecutor's statement was a reasonable deduction from the evidence.

**D. Failure to Introduce Evidence**

Outside the jury's presence and before the defense began its case-in-chief, defense counsel raised the argument that Ahn had a propensity for violence and the evidence would show Ahn had been convicted on one family assault violence charge, a second family violence charge, and a protective order issued against him. The trial court stated that unless self-defense was raised, the prior bad acts of the victim could not come in. During the defense's case-in-chief, Gonzalez's trial attorney raised self-defense, but did not seek to introduce the bad-act evidence. On appeal, Gonzalez asserts trial counsel was ineffective because the trial court's statement implied a willingness to allow the bad-act evidence to be admitted once self-defense was raised.

The record is silent as to trial counsel's reason for not raising Ahn's prior bad acts. During the discussion with the trial court, the court noted none of the acts involved Rachel and that she may not have been aware of Ahn's actions when she stated Ahn was not violent towards her, except for the one time he kicked her. Defense counsel may have decided—as a matter of strategy—to not raise the prior bad acts. Because Gonzalez's complaint is not firmly founded in the record, he has not overcome the strong presumption that counsel's actions were reasonable trial strategy.

## CONCLUSION

For the reasons stated above, we overrule Gonzalez's issues on appeal, and affirm the trial court's judgment.

Rebeca C. Martinez, Justice

Do not publish